276 Neb. 393
STATE OF NEBRASKA, APPELLEE,
v.
PAUL F. SCHREINER, APPELLANT.
No. S-07-828,
No. S-07-829.
Supreme Court of Nebraska.
Filed August 15, 2008.
Bernard J. Glaser, Jr., for appellant.
Jon Bruning, Attorney General, and Kimberly A. Klein for appellee.
WRIGHT, CONNOLLY, GERRARD, STEPHAN, and MILLER-LERMAN, JJ., and SIEVERS, Judge.
GERRARD, J.

I. NATURE OF CASE
Paul F. Schreiner was convicted of first degree sexual assault on a child, based on a sexual encounter that had occurred with K.G., a 14-year-old girl, after he gave her a ride home from the Nebraska State Fair.[1] Schreiner was also found to have violated an order of probation imposed for two previous convictions of sexual assault of a child.[2] In case No. S-07-828, Schreiner appeals from his conviction and sentence for first degree sexual assault. In case No. S-07-829, Schreiner appeals from the revocation of his probation.

II. BACKGROUND
Schreiner was 22 years old at the time of the alleged assault, and K.G. was 14 years old. K.G. testified that she and her twin sister, D.G., met Schreiner at a gas station in August 2005, while the girls were walking home from a shopping mall. D.G. said that they were walking up to the gas station and "said hi to him and started talking to him" and that K.G. had initiated the conversation. Schreiner offered them a ride home, and they accepted. According to Schreiner, K.G. asked for his telephone number when he dropped the girls off at home. A few hours later, he got a call from one of the girls, who identified herself as K.G. She asked for a ride back to the mall, which he provided. Schreiner said that both girls called him several times in the following days. Schreiner testified that he decided "they wanted somebody to talk to that they felt comfortable with. And I felt that maybe I should be friends with them just because of the situation that they said that they were in."
On Monday, September 5, 2005, K.G. went to the state fair and ended up meeting Schreiner there. Although the various witnesses' accounts differ in the details, it is not disputed that K.G. left the fair with Schreiner. And when K.G. called home later, she became aware that the police had been told that she was missing. She was upset about that and did not want to go home, so she went to Schreiner's residence instead.
K.G. said that when they got there, she went downstairs while he got them some sodas. K.G. testified that she went to the bathroom and that when she came out, a hide-a-bed, had been pulled out of the couch. K.G. said there were sheets and a blanket on the bed. Schreiner, on the other hand, said that there was no bedding on the hide-a-bed, just a sleeping bag. He said the bed was already pulled out when they returned to the residence.
K.G. testified that after she came out of the bathroom, Schreiner was by the bed, and she and Schreiner started kissing. They got on the bed, and K.G. undressed. Schreiner undressed as well, and they had sexual intercourse on the bed. K.G. described the sex as "normal" vaginal intercourse. K.G. said she did not see Schreiner wearing a condom and did not know if he ejaculated. Then, Schreiner told K.G. he was going to bed, and he went to sleep.
Schreiner, on the other hand, testified that when K.G. went to the bathroom, he set his alarm, turned off the lights, and played some music. K.G. came out of the bathroom and went to the hide-a-bed, while he went to sleep on the couch. Schreiner specifically denied kissing K.G. or having sex with her. Schreiner testified that when the alarm went off in the morning, he saw that K.G. was not wearing her jeans. She got dressed, and he took her directly home.
Schreiner said that he had previously had sex with someone else on the sleeping bag that he said was on the hide-a-bed, and had recently masturbated while on the sleeping bag. Schreiner testified that he ejaculated on top of his sleeping bag without cleaning it up.
K.G. said that after she was dropped off at home, she went into the house and changed her underwear and pants. She put the clothes she took off in the laundry and washed them. Then she went to her sister's room to go to sleep. K.G. testified that the next thing she remembered after going to sleep was that her mother came to get her, because a police officer was there to see her. K.G. told the officer what had happened between her and Schreiner. The officer testified that K.G. was reluctant to talk to him, but that based on what he was told, he and K.G.'s mother searched the residence for some articles of K.G.'s clothing. K.G.'s mother testified that she helped the officer make sure that K.G. did not change clothes, although she could not say that K.G. had not changed clothes already. She also looked for clothing in the washing machine, but it was empty.
K.G. testified that she did not want to tell police about what happened with Schreiner, because she knew it would get him in trouble and she did not want that. The police officer told K.G. that K.G. was going to the Child Advocacy Center, which she did, with her family, later that morning. K.G. was interviewed at the Child Advocacy Center and then taken to the hospital. K.G. testified that before she went to the hospital, she had not had an opportunity to shower or bathe. K.G. was examined at the hospital, and the nurse took all her clothing. K.G. testified that because she had changed clothes, the jeans and underwear that were taken from her and tested were not the jeans and underwear she had been wearing at the state fair and at Schreiner's residence. K.G. admitted lying to her father and to the police about changing clothes, because she did not want to get Schreiner in trouble and did not want to give up the clothes that she had been wearing.
Diana Severson-Tomek, a sexual assault nurse examiner (SANE) at BryanLGH Medical Center, performed the examination of K.G. Severson-Tomek testified that during the examination, K.G. said she had not showered, bathed, or douched before the examination. K.G. also told Severson-Tomek that she had not had anything to drink and that she had not changed clothes. Severson-Tomek gathered physical evidence from K.G.: most pertinently, vaginal and rectal swabs. The procedure used for Severson-Tomek's examination will be explained in more detail below. Those samples, along with reference samples taken from Schreiner, were delivered to the University of Nebraska Medical Center's human DNA identification laboratory for testing.
A DNA analyst testified regarding the testing. The analyst tested four items: the vaginal and rectal swabs from K.G., K.G.'s underwear, and the reference sample from Schreiner. The analyst performed two different tests for semen on the swabs and underwear. On each swab, one test returned positive results, while the other returned negative results. But the underwear tested positive for semen in both tests. The only DNA profile obtained from the vaginal swab was from a single female contributor, presumably K.G. But the rectal swab and underwear yielded a mixture of DNA from two contributors.
When the mixtures were compared to reference samples, the contributors were determined to be K.G. and Schreiner. Schreiner was the major contributor to the sample from the underwear, and the testing indicated "primarily sperm cells contributing to that DNA fraction."
Schreiner was charged by information with first degree sexual assault. The State also moved to revoke Schreiner's probation for some previous convictions. The jury found Schreiner guilty of first degree sexual assault. At a later hearing, the court found that Schreiner had violated his order of probation.
On the sexual assault conviction, Schreiner was sentenced to a period of 6 to 9 years' imprisonment. For the probation violations, Schreiner was sentenced to two terms of 2 to 3 years' imprisonment, to be served consecutively to one another and to the sentence from the sexual assault proceeding. Schreiner was also given a "Notice of Lifetime Parole Supervision," informing him that he was subject to lifetime community supervision by the Office of Parole Administration.
Other details regarding the proceedings will be set forth below, with respect to Schreiner's specific assignments of error. Although Schreiner has appealed separately from his conviction for first degree sexual assault and the revocation of his probation, we have consolidated his appeals for disposition.

III. ANALYSIS

1. CONSOLIDATED TRIAL ON PROBATION VIOLATION

(a) Assignment of Error
In case No. S-07-828, and as his sole assignment of error in case No. S-07-829, Schreiner assigns that the court erred in trying the sexual assault charge at the same time as the probation violation charge, in violation of Neb. Rev. Stat. § 29-2002 (Reissue 1995) and the due process and assistance of counsel clauses of the state and federal Constitutions.

(b) Standard of Review
[1-3] The revocation of probation is a matter entrusted to the discretion of the trial court.[3] And the general conduct of the trial rests within the discretion of the trial court.[4] A judicial abuse of discretion exists only when the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result in matters submitted for dispositions.[5]

(c) Background
Schreiner had been convicted in 2004 of two counts of sexual assault of a child, based on allegations of two separate instances of sexual intercourse with, respectively, a 13-year-old and 14year-old girl. Schreiner had been sentenced to a 3-year term of probation pursuant to a plea agreement. After the incident with K.G., the State filed a motion to revoke Schreiner's probation.
The motion alleged that Schreiner had violated the conditions of his probation by failing to (1) refrain from unlawful or disorderly conduct or acts injurious to others and (2) meet with his probation officer.
Before trial, at a hearing scheduled on the alleged probation violation, Schreiner's counsel informed the court that there was no reason to go forward on the probation violation until the trial on the sexual assault was finished. Counsel noted that the allegations in the sexual assault case were "at least half of the allegation for the revocation." Counsel informed the court that if Schreiner was found guilty in the sexual assault case, there would be no reason to contest the probation violation, and counsel "just thought it would be [a] more efficient use of the Court's time not to have the two trials over the same evidence."
But when the State suggested that the court use the testimony at the sexual assault trial to determine the factual basis for the probation revocation hearing, Schreiner objected, arguing that he would be put in the position of "trying to persuade two different fact finders here" and that it might affect his examination of witnesses. The court agreed that there could be facts relevant to the probation proceeding that were not relevant to the sexual assault and that it did not "want those brought up during this trial before this jury."
But the court was concerned that the trial could be lengthy, and the court did not want to go through a second trial hearing the same evidence. The court suggested that differences in the proceedings could be addressed with a further evidentiary hearing on the motion for revocation of probation, at which the record of the trial in the sexual assault case could be offered.
After Schreiner was convicted in the sexual assault proceeding, a separate hearing was had on the probation violation. Schreiner admitted he had not met with his probation officer as directed. Based on that and "on the evidence that [the court] heard in the trial in this matter that was tried" in the sexual assault proceeding, the court found that Schreiner had violated his order of probation. The court took judicial notice of the trial record from the sexual assault proceeding. Schreiner preserved his objection to the conjoined trial.

(d) Analysis
[4] In support of his argument that the court erred in trying the probation violation at the same time as the first degree sexual assault charge, Schreiner cites § 29-2002, which explains when "two or more indictments, informations, or complaints" may be tried together. But we are not dealing here with a joinder of two separate criminal charges. Instead, we have one information, containing one criminal charge, and a separate motion to revoke probation, which is not a criminal proceeding.[6] Section 29-2002 is not applicable here.
More pertinent is the Nebraska Probation Administration Act,[7] which provides:
Whenever a motion or information to revoke probation is filed, the probationer shall be entitled to a prompt consideration of such charge by the sentencing court. The court shall not revoke probation or increase the requirements imposed thereby on the probationer, except after a hearing upon proper notice where the violation of probation is established by clear and convincing evidence. The probationer shall have the right to receive, prior to the hearing, a copy of the information or written notice of the grounds on which the information is based. The probationer shall have the right to hear and controvert the evidence against him, to offer evidence in his defense and to be represented by counsel.[8]
Those requirements were met in this case. On our review of the record, it is not clear how Schreiner was prejudiced by the court's consolidation of the hearing on his probation violation with the trial on his sexual assault charge. If anything, the consolidation of those matters benefited Schreiner, by providing him the "prompt consideration" of the charge to which he was entitled by law.[9]
Schreiner argues that he was denied "a focused competent defense strategy on either the criminal trial or the revocation of probation matter."[10] It is difficult to see how. Schreiner argues that trying to address different issues, and different burdens of proof, hampered his adduction of evidence. But he does not provide any example of when that occurred. At trial, he did not make any offer of proof with respect to evidence he would have adduced had the hearing not been consolidated. Nor did he object, at trial, to any instance in which he was supposedly compelled to adduce evidence that he otherwise would not have adduced.
And at the subsequent hearing dedicated solely to the probation violation, Schreiner admitted failing to meet with his probation officer. He did not present any of the evidence, call any of the witnesses, or ask any of the questions that had purportedly been denied him at the sexual assault trial.
Simply put, we can find nothing in this record to suggest that Schreiner was prejudiced by the consolidation of these proceedings. Consolidation facilitated the prompt consideration of the probation revocation charge. And it is obvious that avoiding the need for another week-long trial made far more efficient use of the court's and State's resources. Absent evidence of prejudice to Schreiner, and given the evident advantages of consolidation, we find no abuse of discretion.

2. DAUBERTISCHAFERSMAN OBJECTION TO SEVERSON-TOMEK TESTIMONY

(a) Assignment of Error
Schreiner assigns that the court erred in admitting the testimony of Severson-Tomek, as her testimony lacked foundation under DauberdSchafersman[11] standards.

(b) Standard of Review
[5] The standard for reviewing the admissibility of expert testimony is abuse of discretion.[12]

(c) Background

(i) Motion in Limine
Schreiner filed a motion in limine raising, among other things, a Daubert/Schafersman objection to Severson-Tomek's testimony. Specifically, Schreiner moved that Severson-Tomek not be permitted to testify "concerning any opinion that the substance obtained in such witness's SANE examination of [K.G.] was consistent with sperm and that her examination of [K.G.] showed evidence consistent with `rough sex', words to that effect, or any other opinion concerning her examination of [K.G.]"
At the hearing on the motion, Schreiner objected to any testimony about Severson-Tomek's discovery of a stain consistent with sperm, or about "rough sex." But the court determined that the substance of the motion went to foundation, not a Daubertl Schafersman issue. The court specifically determined that the physical observations that Severson-Tomek made in the course of the examination were relevant and admissible, assuming proper foundation. The motion was sustained as to any comment regarding "rough sex," but otherwise overruled.

(ii) Severson-Tomek's Testimony
When she testified, Severson-Tomek explained the training and education necessary to become a certified SANE, and her qualifications and experience are not disputed. She had been performing examinations as a SANE for about 21/4 years and had performed approximately 83 such examinations. For each examination of a suspected sexual assault victim, Severson-Tomek employed the same methods and procedures, and she specifically testified that the methods and procedures that she used were generally accepted.
Severson-Tomek also explained those procedures in more detail. A sexual assault kit is used to specifically assist in the collection of physical evidence. There are 14 steps in the use of a sexual assault kit: consent and collection of patient history, collection of underwear, collection of debris from clothing, fingernail scrapings, three collections of hair samples, a saliva sample, an oral swab, a vaginal swab and smear, a rectal swab, and a blood sample. All of the steps are performed, unless the patient refuses. A colpo scope is used to conduct a detailed examination of the patient's genitalia. The colposcope provides magnification and illumination and takes photographs. Ultraviolet light is used to look for additional evidence. Laboratory tests are performed on bodily fluid samples, and the patient's clothing is collected. The SANE's findings are reviewed by the emergency room doctor, and another SANE reviews the photographs and makes her own observations.
According to Severson-Tomek, K.G. was cooperative and did not refuse any part of the procedure. Severson-Tomek testified, over objection, to several abnormal abrasions that she observed during her examination of K.G. Severson-Tomek specifically testified that she did not have an opinion as to the cause of an abrasion she observed on K.G.'s cervical os, or opening, and she did not offer any other opinion as to what could have caused the other abnormalities she observed.

(d) Analysis
[6] Under our Daubert/Schafersman[13] jurisprudence, the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion. This gatekeeping function entails a preliminary assessment whether the reasoning or methodology underlying the testimony is valid and whether that reasoning or methodology properly can be applied to the facts in issue.[14] Schreiner argues that given its gatekeeping responsibility, the district court abused its discretion in admitting Severson-Tomek's testimony.
[7] But Daubert does not create a special analysis for answering questions about the admissibility of all expert testimony. Not every attack on expert testimony amounts to a Daubert claim. If a witness is not offering opinion testimony, that witness' testimony is not subject to inquiry pursuant to Daubert.[15] And here, Severson-Tomek's testimony at trial was not opinion testimony. Severson-Tomek made observations of K.G.'s physical condition and testified about her observations. Although Severson-Tomek was qualified to offer expert testimony, she was testifying to matters within her personal knowledge.[16] As the district court correctly determined, this is simply not the sort of expert testimony that demands a Daubert inquiry.
If Severson-Tomek offered any opinions, they were implicit in her testimony that her examination of K.G. revealed abnormalities. To the extent that this involved a scientific methodology, it was simply empirical: Severson-Tomek examined K.G. and described her observations. It is hard to imagine any method of scientific inquiry that is more well established. Severson-Tomek was well qualified to testify that the abrasions revealed in her examination of K.G. were not normal, and Severson-Tomek testified at length about the procedures she used to make her observations. And she specifically testified that her method of examination was generally accepted.
The district court did not abuse its discretion in concluding that the foundation offered for Severson-Tomek's testimony was sufficient. Therefore, Schreiner's assignment of error is without merit.

3. CROSS-EXAMINATION OF K.G. ON CONTACTS WITH POLICE AND JUVENILE SYSTEM

(a) Assignment of Error
Schreiner assigns that the court erred in refusing to permit cross-examination of K.G. with respect to (1) prior contacts with the juvenile court system and (2) whether she had lied to a police officer.

(b) Standard of Review
[8,9] When the object of cross-examination is to collaterally ascertain the accuracy or credibility of the witness, some latitude should be permitted, and the scope of such latitude is ordinarily subject to the discretion of the trial judge, and, unless abused, its exercise is not reversible error.[17] And determinations regarding cross-examination of a witness on specific instances of conduct, pursuant to Neb. Evid. R. 608(2),[18] are specifically entrusted to the discretion of the trial court.[19]

(c) Background
The State filed a motion in limine to preclude any evidence that K.G. or D.G. had contact with law enforcement except as related to this case, any violations of law, or any cases pending in juvenile court. At the hearing, Schreiner contended that K.G. had stayed at Schreiner's house because she was afraid to go home, since she would get in trouble for having run away. Schreiner argued that K.G.'s prior contact with law enforcement showed she had been in trouble for running away before, supporting Schreiner's contention that K.G. was staying with Schreiner voluntarily. The State replied that it was uncontested that K.G. had stayed at Schreiner's, because she was a runaway and afraid to go home, and that K.G. was at Schreiner's voluntarily. The court sustained the State's motion.
Schreiner further argued that K.G. had been adjudicated for lying to a police officer and that he should be allowed to question her about that because it was a crime of dishonesty. The State replied that juvenile adjudications are not admissible for such purposes,[20] and the court sustained the State's motion in that respect as well.
At trial, Schreiner made an offer of proof, claiming that if asked, K.G. would admit to lying to a police officer. Schreiner offered that testimony "under rule 27-608 instead of 27-609."[21] But Schreiner also asserted that K.G. had been "adjudicated as such in Juvenile Court of Lancaster County and it's been within the last year." The offer of proof was overruled.

(d) Analysis
[10] We begin by determining which of the issues discussed in the trial court have been presented to this court for review. Pursuant to Neb. Evid. R. 103(1)(b),[22] error may not be predicated upon a ruling which excludes evidence unless a substantial right of the party is affected, and the substance of the evidence was made known to the judge by offer or was apparent from the context within which questions were asked. So, in order to predicate error upon a ruling of the court refusing to permit a witness to testify, or to answer a specific question, the record must show an offer to prove the facts sought to be elicited.[23]
[11,12] And that offer of proof must be made at trial. A motion in limine is only a procedural step to prevent prejudicial evidence from reaching the jury. It is not the office of such motion to obtain a final ruling upon the ultimate admissibility of the evidence.[24] Because overruling a motion in limine is not a final ruling on the admissibility of evidence and does not present a question for appellate review, a question concerning the admissibility of evidence which is the subject of a motion in limine is raised and preserved for appellate review by an appropriate objection or offer of proof during trial.[25]
Therefore, although many issues were discussed in conjunction with the State's motions in limine, we consider only the issues preserved by Schreiner's offer of proof.[26] At trial, Schreiner offered to prove two facts: that K.G. had given false information to a police officer and that K.G. had been adjudicated for doing so in juvenile court. Our appellate review is limited to whether Schreiner should have been permitted to cross-examine K.G. about either of those facts.

(i) Juvenile Adjudication
Schreiner first argues that he should have been allowed to cross-examine K.G. about her adjudication in juvenile court. Specific instances of the conduct of a witness, for the purpose of attacking or supporting her credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence.[27] Rule 609(1)(b) provides that for the purpose of attacking the credibility of a witness, evidence that she has been convicted of a crime shall be admitted if elicited from her or established by public record during cross-examination, if the crime involved dishonesty or false statement. But rule 609(4) expressly provides that lelvidence of juvenile adjudications is not admissible under this rule."
Schreiner argues that the evidence should have been admitted anyway, relying on Davis v. Alaska,[28] in which the U.S. Supreme Court held that the trial court's refusal to allow the defendant to cross-examine a key prosecution witness to show his probation status following an adjudication of juvenile delinquency denied the defendant his constitutional right to confront witnesses, notwithstanding a state policy protecting the anonymity of juvenile offenders. But Davis is distinguishable, and Schreiner's argument is unpersuasive.
[13-17] The Sixth Amendment to the U.S. Constitution guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him,"[29] and the main and essential purpose of confrontation is to secure the opportunity of cross-examination.[30] The exposure of a witness' motivation in testifying is a proper and important function of the right of cross-examination.[31] But it does not follow that the Confrontation Clause prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness.[32]
On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. . . . "[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."[33]
In Davis, a key prosecution witness was on probation, having been adjudicated for burglary. The defendant argued that although juvenile records were confidential, he should have been allowed to cross-examine the witness about his probation, because the witness might have been subjected to undue pressure from police, fearing possible probation revocation. The Court carefully distinguished between the "introduction of evidence of a prior crime [as] a general attack on the credibility of the witness" and "[a] more particular attack on the witness' credibility . . . by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand."[34] The Court found the circumstances in Davis to be an example of the latter and reasoned that the state's policy interest in protecting the confidentiality of a juvenile offender's record could not require the defendant to yield his right to crossexamine a witness for a particular bias.[35]
[18] Based on the distinction between general credibility and specific bias, courts to have addressed the issue
"have been reluctant to extend [Davis] to justify admitting juvenile adjudications offered to impeach under Rule 609. It makes some sense to draw such a distinction between juvenile-adjudication evidence offered to impeach for bias and such evidence offered to impeach under Rule 609. Evidence offered under Rule 609 undermines credibility only indirectly by showing a criminal character and, thus, a propensity which is only generally linked to truthfulness. On the other hand, bias evidence shows the witness has a motive to lie in the specific case."[36]
In other words, the Confrontation Clause does not require that courts permit the use of juvenile adjudications for general impeachment of credibility.[37]Davis neither "holds nor suggests that the Constitution confers a right in every case to impeach the general credibility of a witness through cross-examination about his [or her] past delinquency adjudications or criminal convictions."[38]
Schreiner's offer of proof in this case did not establish a basis for cross-examination equivalent to the bias suggested in Davis. The evidence Schreiner offered to prove was directed at K.G.'s credibility, but did not provide a basis to establish a particular bias. Although K.G.'s deposition indicated, at the hearing on the motions in limine, that K.G. was on probation at the time of her deposition, there was no offer at trial to prove that she was on probation when she testified.[39] And there was no offer to prove, nor evidence in the record to suggest, that K.G.'s adjudication provided a specific motive to testify untruthfully.[40]
Schreiner argues in his brief that K.G. lied to her mother and to the police about the alleged sexual encounter with Schreiner because she was afraid of getting in trouble for having been gone all night. Schreiner suggests that K.G. then reasserted her lie at trial, because she was afraid of prosecution if she contradicted her earlier statement to the police. But Schreiner was able to effectively cross-examine K.G. and present that theory at trial. The fact of a prior adjudication would not substantially change K.G.'s alleged motive to conform her trial testimony to her earlier statements. The limitation of Schreiner's crossexamination did not "prohibit[] all inquiry into the possibility that [the witness] would be biased"[41] by fear of contradicting her earlier statements. In other words, Schreiner's theory about K.G.'s specific motive to lie did not rest upon, and was not particularly supported by, the fact of her adjudication. And to say that K.G.'s credibility was still vigorously challenged on cross-examination is, given our review of the record, something of an understatement.
Even if K.G.'s deposition testimony had been referenced as the basis for Schreiner's offer of proof at trial, K.G.'s deposition is far from clear about the basis for her probation. It was apparent that after the alleged incident with Schreiner, but before K.G. was deposed, she had been placed on probation and in a group home by the juvenile court. However, the decision to put K.G. on probation appears to have been primarily based on drug use, truancy, and running away from home-not giving false information to an officer. In other words, Schreiner's offer at trial to prove that K.G. had been adjudicated for lying to an officer did not offer to prove, or even clearly implicate, K.G.'s status as a probationer.
And asking K.G. why she was on probation would have implicated a number of related subjects, such as truancy and drug use, that would have been irrelevant and unfairly prejudicial. That also distinguishes this case from Davis, because "[t]he competing policy at stake here is markedly different from that which the Davis Court found subordinate to the right of cross-examination."[42]
In Davis, "the trial court had limited cross-examination of the government witness in order to protect him from the embarrassment of having his prior juvenile record exposed. The sole interest served by that ruling was that of the witness."[43] On the other hand, such things as Ihlearsay, evidence of bad character or propensity to commit crimes, and evidence that may unduly prejudice the jury are generally excluded because of their adverse effect on the reliability of the fact-finding process."[44]
The Court's decision in Davis rested on the balance between the defendant's right to cross-examine a witness about a motive to lie in the specific case and the government's generalized interest in protecting the confidentiality of a juvenile record. In this case, Schreiner's offer of proof was directed only at general impeachment of a witness' credibility, but implicated the government's interest in the fairness and reliability of the trial process.[45]
[19] A criminal defendant states a violation of the Confrontation Clause by showing that he or she was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, thereby exposing to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness.[46] But the only fact Schreiner offered to prove here was that K.G. had been adjudicated for lying to a police officer. This offer of proof did not suggest a motive for bias comparable to that in Davis,[47] and it implicated other subjects that were clearly inadmissible. On balance, we cannot say that the district court abused its discretion in overruling Schreiner's narrow offer of proof with respect to K.G.'s juvenile adjudication.

(ii) False Statement to Officer
Schreiner also argues that he should have been allowed to ask K.G. about the underlying conduct of lying to a police officer. While specific instances of the conduct of a witness, for the purpose of attacking or supporting her credibility, may generally not be proved by extrinsic evidence, rule 608(2) provides that specific instances of the conduct of a witness "may, however, in the discretion of the court, if probative of truthfulness or untruthfulness be inquired into on cross-examination of the witness . . . (b) concerning [her] character for truthfulness or untruthfulness.[48]
We are not persuaded that the court abused its discretion by overruling Schreiner's offer of proof here. The offer of proof was simply that K.G. would, if asked, testify that she had given false information to a police officer. This was, evidently, a reference to an incident referred to in K.G.'s deposition, in which K.G. had run away from home for "about a week," and then apparently told the police that she had been with her sister. Schreiner contends that this testimony "would have shown that [K.G.] had no compunction about lying to those in authority."[49]
But the district court had already sustained the State's motion to preclude any evidence about K.G.'s having run away from home and other kinds of misconduct. Other than the issue under discussion, Schreiner does not challenge that ruling on appeal. And without reference to the incident Schreiner offered to prove, K.G. still admitted on cross-examination that she had lied to her parents, the police, and even at her deposition, about the clothing she had been wearing on the night of the alleged sexual encounter. It is difficult to see what additional value Schreiner could have obtained from the incident he offered to prove, unless he was able to inquire about the specific circumstances of the falsehood. And that would have been beyond the scope of the inquiry permitted by rule 608(2)(b).
In short, the incident Schreiner offered to prove was inextricably linked to other, inadmissible evidence, and Schreiner was able to make the same point through other questions. We do not find an abuse of the district court's discretion in its overruling of Schreiner's offer of proof. And even had the evidence been improperly excluded, the evidence was cumulative and there was other competent evidence to support the conviction, so the improper exclusion was harmless beyond a reasonable doubt.[50]
In summary, we find no abuse of discretion, or prejudicial error, in the district court's overruling of Schreiner's offer of proof regarding K.G.'s adjudication. Schreiner's assignment of error is without merit.

4. DNA EVIDENCE

(a) Assignment of Error
Schreiner assigns that the court erred in admitting K.G.'s underwear into evidence and in allowing testimony regarding DNA testing of K.G.'s underwear, because it was not relevant.

(b) Standard of Review
[20] The exercise of judicial discretion is implicit in determinations of relevancy, and a trial court's decision regarding it will not be reversed absent an abuse of discretion.[51]

(c) Background
As described above, DNA testing found Schreiner's sperm on K.G.'s underwear. Schreiner objected to the test results relating to the underwear, because K.G. testified that she had changed clothes after the alleged assault, and Schreiner "object[ed] to any further testimony until the State . . . proves that those were actually the underpants that she was wearing at the time that this allegation occurred."
But the DNA analyst testified that semen can leak from the vagina on to underwear after the underwear has been put back on. The district court overruled Schreiner's objection, so the underwear was admitted into evidence and testimony regarding DNA testing of the underwear was allowed. On cross-examination, the analyst admitted that it was possible for DNA to be transferred to clothing and then transferred again to a third person.

(d) Analysis
Relevant evidence means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.[52] Evidence which is not relevant is not admissible.[53] Schreiner argues that the DNA evidence discussed above was not relevant. His argument, essentially, is that the evidence was irrelevant because K.G. testified at trial that she changed clothes when she got home, so the DNA samples were taken from underwear that K.G. testified she put on the day after the alleged sexual encounter.
[21] The court did not abuse its discretion in admitting the DNA testing of K.G.'s underwear. K.G.'s trial testimony that she changed clothes simply does not make the DNA evidence irrelevant. The jury could have concluded, from the evidence, that K.G. had not actually changed clothes. And the DNA analyst's testimony would support the conclusion that even had K.G. changed clothes, residual semen from a sexual encounter could have leaked on to her clean underwear. In any event, evidence is relevant if it tends in any degree to alter the probability of a material fact.[54] The presence of Schreiner's sperm on K.G.'s underwear made it more likely that K.G. and Schreiner had a sexual encounter. Therefore, the court did not abuse its discretion in admitting the evidence, and Schreiner's assignment of error is without merit.

5. LENGTH OF TRIAL DAYS

(a) Assignment of Error
Schreiner assigns that the court erred in "permitting the trial to continue until after 8:00 p.m. on at least two days."

(b) Standard of Review
[22] The general conduct of the trial rests within the discretion of the trial court.[55] And a trial court's order denying a motion for new trial is reviewed for an abuse of discretion.[56]

(c) Background
The court held a housekeeping hearing after voir dire was completed on Thursday, April 19, 2007. In the course of discussing the length of opening statements, the court informed counsel that "we're going to have to start telling the jury we're going until 6:00 o'clock." The court explained that the case had to be completed by Wednesday of the following week, because the following Thursday was "completely booked up" and Friday was a court holiday. So, the court stated that "whatever the case, if it takes working on Saturday," it was necessary to have the case submitted to the jury by the end of the day on the following Wednesday. Schreiner's counsel replied that he had "no problem with going to 6:00 o'clock."
During the morning recess the next day, the court again met with counsel regarding scheduling. Based on the representations of counsel regarding the length of their respective cases, the court informed them that it planned to "go until 5:00 today. And next week what we're going to do is, we'll start at 8:30 each day and we'll start at 1:30 each day. And we'll plan on  plan on going until at least 5:00." The court acknowledged that it "sounds like we're going to be pushing" to get the case submitted to the jury by the end of the day on the following Wednesday. The court informed the jury of the proposed schedule after the recess. At no point did Schreiner object.
The State was still presenting its case in chief on Monday afternoon, and the court asked the State about the schedule during the afternoon recess. The State said it was behind. The court concluded that it would "tell the jury that we'll go until 6:00 o'clock tomorrow evening and probably go until 6:00 o'clock on Wednesday." The court added, "Wednesday we'll just go until we're finished. That's what I'm going to tell the jury, they should just be prepared to go until we finish. Because we do need to have it finished by Wednesday." Schreiner did not object. At about 5 p.m., the court informed the jury that it had been
informed by the attorneys that we are considerably behind from where we expected to be at this point in time in the trial and it is necessary for us to . . . extend the time that you're going to be required to be here in order to get this trial completed. So I'm going to . . . change our schedule a bit.
We are going to start at 8:00 o'clock tomorrow morning. We're going to go until noon. And then we're going to resume at 1:00 o'clock. And tomorrow we're going to go until 7:00. Now, we will take a half hour break between 4:30 and 5:00 so you can get some meals and that sort of thing.
And I'll try to give you plenty of breaks so that you don't get too overly tired. I know it's going to be a grueling day tomorrow. On Wednesday I'm anticipating that we will go until we are finished. Now that may be even longer than we're going tomorrow. And if it looks like it's going to take considerably longer than that, we'll probably take an hour break in the evening so that you do have a bit more of an extended break here.
I apologize for this. We try not to let this happen. But it's going to be necessary in this case so that we can get it completed.
The jury was excused, and a conference was had on several matters, at the conclusion of which the court informed counsel that "the way we're going right now, I'm going to anticipate that we're just going to go straight through. So we'll instruct the jury whenever we're ready, and we'll do closing arguments just whenever the evidence is completed." Schreiner did not object at any point.
The jury was provided with a dinner break on Tuesday, from 4:35 to 5:10 p.m. Another recess was taken from 6:06 to 6:21 p.m., and the jury was released on Tuesday at 6:59 p.m. On Wednesday, after the defense rested, the jury was released from 3:09 to 5:06 p.m., while the court held the jury instruction conference. Closing arguments were made, the jury was instructed, and the case was submitted to the jury at 6:24 p.m.
The record does not reflect how late the jury deliberated that evening. But the jurors were told that they did not have to deliberate that evening; that if they did deliberate, they could stop for the evening at any time they chose; and that in any event, they should not deliberate later than 8:30 p.m. Schreiner did not object at any point. At 9:52 a.m. the next day, a teleconference was held with respect to a question from the jury. A followup question was discussed in a teleconference at 10:29 a.m. The jury returned its verdict at 10:44 a.m. on the following day, Friday, April 27, 2007.
Schreiner based his motion for new trial, in part, on the complaint that the trial days had been too long. Schreiner's counsel admitted he did not object, but said he "did not realize the impact of the procedure we followed here until the jury had already begun its deliberations." The motion was overruled.

(d) Analysis
[23] Schreiner argues that the court should have sustained his motion for new trial, based on the length of the trial days. But despite several obvious opportunities, Schreiner never objected to the court's stated intent to work late in order to complete the trial during the available time. The failure to make a timely objection waives the right to assert prejudicial error on appeal.[57] One cannot know of purportedly improper judicial conduct, gamble on a favorable result as to that conduct, and then complain that he or she guessed wrong and does not like the outcome.[58] The court certainly did not abuse its discretion in overruling a motion for new trial that was predicated on grounds that had been waived during the trial.
[24,25] Nor does any plain error appear on the record. The record, as summarized above, simply does not support Schreiner's assertion that the court "permit[ed] the trial to extend to well after 8:00 p.m."[59] on Tuesday and Wednesday. And generally, trial courts have wide discretion to ensure that the goal of timely disposition of cases is reached.[60] Trial courts must have a great deal of latitude in striking the balance between the court's calendar and a party's right to a fair chance to be heard.[61] Of course, this discretion is not unbounded. Attorneys, witnesses, and jurors should not be asked, absent extremely unusual circumstances, to perform their important duties while battling mental and physical exhaustion.[62] But that did not happen here. Instead, the record demonstrates that the court kept the jury informed, took appropriate breaks, and in general, carefully exercised its discretion to complete the trial in this case during the time available.
In short, Schreiner did not object to the length of the trial days until after he was convicted, and the record does not support his argument in any event. We find no merit to his assignment of error.

6. INQUIRY INTO K.G.'S MENTAL HEALTH AND MEDICATION

(a) Assignment of Error
Schreiner assigns that the court erred in not permitting him to inquire into K.G.'s mental health status and her use of psychotropic drugs and their adverse effect on her memory.

(b) Standard of Review
The scope of cross-examination of a witness rests largely in the discretion of the trial court, and its ruling will be upheld on appeal unless there is an abuse of discretion.[63]

(c) Background
The State filed a motion in limine asking, among other things, for an order precluding any evidence of mental health issues of K.G. or D.G. At the hearing on the State's motion, Schreiner asserted that during her deposition, K.G. had said that she was being treated for a mental illness and that her medication affected her memory. The State disagreed with that interpretation of K.G.'s deposition testimony. K.G.'s deposition was received as evidence at the hearing. In her deposition, K.G. explained that she had been diagnosed with a mental illness and had been prescribed medication to treat it. But K.G. did not mention any effect of the medication, or her condition, on her memory. And no offer of proof to that effect was made at trial.
After Schreiner was convicted, at the hearing on his motion for new trial, Schreiner's counsel represented to the court that he had recently "received information that [KG.] suffers from a mental impairment that causes memory loss and was taking medications to treat that impairment." But he represented that he was not basing his motion for new trial on that information, did not have the information from a firsthand source, and just intended "to make a record at this point that I have looked into that" and would file another motion if he ever found evidence to substantiate the information he had been given.

(d) Analysis
Schreiner argues that his Confrontation Clause rights were violated because he "was precluded from cross-examining [KG.] on the question of her mental health."[64] There is nothing in the record to support this claim. As previously noted, in order to predicate error upon a ruling of the court's refusing to permit a witness to testify, or to answer a specific question, the record must show an offer to prove the facts sought to be elicited.[65] No offer of proof was made in this case. The closest Schreiner came was in support of his motion for new trial, and even then, Schreiner's counsel admitted that there was no firsthand basis to believe that K.G.'s memory was impaired.
On appeal, Schreiner relies on State v. Trammel,[66] in which this court discussed the Confrontation Clause as it related to a witness' mental condition. But the issue in Trammel was discovery, not cross-examination. In Trammel, on the facts of the case, this court concluded that the Confrontation Clause required that the defendant be allowed to discover information about a witness' current mental health treatment, despite the physicianpatient privilege.
There is nothing in the record to suggest that Schreiner sought such discovery here, nor does Trammel authorize a "fishing expedition" on cross-examination of a witness. And, as already noted, there was no offer to prove facts relating to K.G.'s mental condition, on cross-examination or otherwise, that were relevant or admissible. Absent such an offer of proof, we find no merit to Schreiner's assignment of error.

7. LIFETIME COMMUNITY SUPERVISION

(a) Assignment of Error
Schreiner assigns that the court erred in finding he was subject to lifetime community supervision under Neb. Rev. Stat. §§ 29-4005 and 83-174.03 (Cum. Supp. 2006), as those statutes (1) constitute an ex post facto law, (2) violate his right to be free from cruel and unusual punishment, and (3) violate his right to due process of law.

(b) Standard of Review
[26] This issue presents a question of law, on which an appellate court is obligated to reach a conclusion independent of the determination reached by the court below.[67]

(c) Analysis
Section 83-174.03(1) provides that
[a]ny individual who, on or after July 14, 2006, (a) is convicted of or completes a term of incarceration for an offense requiring registration under section 29-4003 and has a previous conviction for a registerable offense, (b) is convicted of sexual assault of a child in the first degree pursuant to section 28-319.01, or (c) is convicted of or completes a term of incarceration for an aggravated offense as defined in section 29-4005, shall, upon completion of his or her term of incarceration or release from civil commitment, be supervised in the community by the Office of Parole Administration for the remainder of his or her life.
Schreiner was notified at sentencing that because he had previously been convicted of a registerable offense, he is subject to lifetime community supervision.[68] He argues, on several bases, that the application of this statute to him is unconstitutional. But the initial question is whether these issues are properly before us in this appeal. The State argues that the provisions of § 83-174.03 are not part of the sentence and, therefore, not ripe for adjudication. In the alternative, the State argues that Schreiner waived his constitutional challenge by not raising it in the trial court.
We addressed a similar issue in State v. Torres.[69] In Torres, the defendant challenged the registration requirements of the Sex Offender Registration Act (SORA)[70] in a direct appeal from his conviction and sentence. But we explained that SORA's registration requirements were separate and collateral to any sexual offense which the act affects, because "SORA's registration requirements arose solely and independently by the terms of the act itself only after [the defendant's] conviction."[71] Thus, we refused to consider the defendant's challenge to his 10-year registration requirement.
But we distinguished Torres in State v. Worm.[72] In Worm, the defendant was subjected, not to a 10-year registration requirement, but to the lifetime registration requirement associated with an aggravated offense.[73] Therefore, his lifetime SORA registration requirement had not arisen solely and independently from the defendant's conviction. Instead, the court had been required, as part of the sentence, to determine whether the offense was aggravated and "make that fact part of the sentencing order."[74] As such, the court's finding that the defendant committed an aggravated offense was part of the court's judgment.[75] So, we determined that the registration requirement for an offender convicted of an aggravated offense was part of the judgment for purposes of filing an appeal and rejected his constitutional challenge to SORA on the merits.[76]
The lifetime community supervision provisions of § 83-174.03 incorporate and mirror the lifetime registration provisions of SORA. But like the defendant in Torres, and unlike the defendant in Worm, Schreiner was not found to have committed an aggravated offense. Instead, because he had previously been convicted of an offense requiring registration under § 29-4003,[77] he was subject to § 83-174.03 automatically, by virtue of his conviction.[78] The operation of § 83-174.03 is entirely independent from the sentence imposed upon Schreiner for first degree sexual assault. As such, any claim Schreiner may have concerning the constitutional implications of § 83-174.03 should be raised if and when he becomes subject to its provisions, but not on a direct appeal from his underlying sexual assault conviction.[79] Any individual who is subject to lifetime community supervision may, whenever a determination or revision of the conditions of community supervision is made, appeal to the district court.[80]
There are also prudential reasons for concluding that Schreiner's challenge is unripe. Unlike SORA, the provisions of which are mandatory, the effects of the lifetime community supervision provision are uncertain until the defendant is released from incarceration. The statute provides that "1nlotice shall be provided to the Office of Parole Administration by an agency or political subdivision which has custody of an individual required to be supervised in the community . . . at least sixty days prior to the release of such individual from custody."[81] Then, lilndividuals required to be supervised in the community . . . shall undergo a risk assessment and evaluation by the Office of Parole Administration to determine the conditions of community supervision to be imposed to best protect the public from the risk that the individual will reoffend."[82] Those conditions can, based on the risk assessment, be rather onerous, up to and including electronic monitoring.[83] But there is no requirement that the Office of Parole Supervision monitor the defendant at all. And that uncertainty, of whether the defendant will be affected at all by these provisions, counsels against weighing their constitutionality before their effects are known.
For those reasons, we agree with the State that Schreiner's constitutional challenges to § 83-174.03 are not ripe for consideration in this appeal. We note that because the issues are unripe, Schreiner was under no obligation to object on that basis in the district court, and has not waived his constitutional claims if and when they become ripe. But in this appeal, they are not before us, and we do not consider them.

8. SUFFICIENCY OF EVIDENCE
(a) Assignment of Error
Finally, Schreiner assigns that the district court erred in finding the evidence sufficient to sustain his conviction for sexual assault.

(b) Standard of Review
[27] In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence. Such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the properly admitted evidence, viewed and construed most favorably to the State, is sufficient to support the conviction.[84]

(c) Analysis
Schreiner's argument, simply stated, is that K.G.'s testimony was unreliable and unsupported by the physical evidence. He points to inconsistencies between K.G.'s testimony and testimony from the other witnesses. He contends that the physical evidence did not support his conviction, because his DNA was not found on all of the swabs taken from K.G., and he claims the evidence did not clearly establish that his sperm was on K.G.'s underwear because of sexual contact.
[28,29] But witness credibility is not to be reassessed on appellate review.[85] Instead, a witness' credibility and weight to be given to testimony are matters for determination and evaluation by a fact finder.[86] The jury in this case was made aware of inconsistencies in the evidence, and it resolved those inconsistencies in favor of the State. The evidence is sufficient to support that conclusion.
Nor are we persuaded by Schreiner's questions about the physical evidence. It is fair to say that the defendant's sperm, found in the victim's underwear, is persuasive circumstantial evidence of sexual contact. While Schreiner raised questions about the DNA evidence, there is sufficient evidence to support the jury's apparent conclusion that Schreiner's explanation for how his sperm got on K.G.'s underwear was less convincing than the State's.
In short, the evidence is more than sufficient to support Schreiner's sexual assault conviction. We find no merit to Schreiner's final assignment of error.

IV. CONCLUSION
We find no merit to Schreiner's evidentiary arguments and no abuse of discretion in the court's conduct of the trial proceedings. The evidence is certainly sufficient to support Schreiner's sexual assault conviction and the revocation of his probation. And finally, we do not address Schreiner's challenges to lifetime community supervision, because they are not ripe for adjudication. The judgments of the district court are affirmed.
AFFIRMED.
McCORMACK, J., participating on briefs.
HEAVICAN, C.J., not participating.
NOTES
[1] See Neb. Rev. Stat. § 28-319 (Reissue 1995).
[2] See Neb. Rev. Stat. § 28-320.01 (Cum. Supp. 2000).
[3] State v. Hernandez, 273 Neb. 456, 730 N.W.2d 96 (2007).
[4] State v. Gales, 269 Neb. 443, 694 N.W.2d 124 (2005).
[5] State v. Moore, 274 Neb. 790, 743 N.W.2d 375 (2008).
[6] See State v. Burow, 223 Neb. 867, 394 N.W.2d 665 (1986).
[7] Neb. Rev. Stat. §§ 29-2246 to 29-2269 (Reissue 1995 & Supp. 2005).
[8] § 29-2267.
[9] See id.
[10] Brief for appellant in case No. S-07-828 at 22.
[11] See, Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); Schafersman v. Agland Coop, 262 Neb. 215, 631 N.W.2d 862 (2001).
[12] State v. Kuehn, 273 Neb. 219, 728 N.W.2d 589 (2007).
[13] Daubert, supra note 11; Schafersman, supra note 11.
[14] State v. Gutierrez, 272 Neb. 995, 726 N.W.2d 542 (2007), cert. denied sub nom. Sommer v. Nebraska, ___ U.S. ___, 128 S. Ct. 186, 169 L. Ed. 2d 126.
[15] State v. Robinson, 272 Neb. 582, 724 N.W.2d 35 (2006).
[16] Compare, Robinson, supra note 15; Sedlak Aerial Spray v. Miller, 251 Neb. 45, 555 N.W.2d 32 (1996).
[17] Kuehn, supra note 12; State v. Privat, 251 Neb. 233, 556 N.W.2d 29 (1996).
[18] See Neb. Rev. Stat. § 27-608(2) (Reissue 1995).
[19] See, id.; State v. Messerstnith, 238 Neb. 924, 473 N.W.2d 83 (1991); State v. King, 197 Neb. 729, 250 N.W.2d 655 (1977).
[20] See Neb. Evid. R. 609(1)(b), Neb. Rev. Stat. § 27-609(1)(b) (Reissue 1995).
[21] See, id.; rule 608, § 27-608.
[22] See Neb. Rev. Stat. § 27-103(1)(b) (Reissue 1995).
[23] Talle v. Nebraska Dept. of Soc. Servs., 253 Neb. 823, 572 N.W.2d 790 (1998).
[24] See State v. Titntnens, 263 Neb. 622, 641 N.W.2d 383 (2002).
[25] See id.
[26] See, § 27-103(1)(b); State v. Navrkal, 242 Neb. 861, 496 N.W.2d 532 (1993).
[27] See § 27-608(2).
[28] Davis v. Alaska, 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974).
[29] U.S. Const. amend. VI.
[30] See Davis, supra note 28.
[31] See id.
[32] Delaware v. Van Arsdall, 475 U.S. 673, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).
[33] Id., 475 U.S. at 679, quoting Delaware v. Fensterer, 474 U.S. 15, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985) (emphasis in original).
[34] See Davis, supra note 28, 415 U.S. at 316.
[35] See id.
[36] Reid v. State, No. 247,2005, 2005 WL 3272134 at *4 (Del. Nov. 30, 2005) (unpublished disposition listed in table of "Decisions Without Published Opinions" at 888 A.2d 232 (Del. 2005)). Accord 28 Charles Alan Wright & Victor James Gold, Federal Practice & Procedure § 6138 (2001).
[37] See, e.g., State v. Spann, 574 N.W.2d 47 (Minn. 1998); State v. Pirtnan, 94 Ohio App. 3d 203, 640 N.E.2d 575 (1994). Compare, e.g., State v. Balisbisana, 83 Haw. 109, 924 P.2d 1215 (1996).
[38] Davis, supra note 28, 415 U.S. at 321 (Stewart, J., concurring).
[39] Compare, e.g., U.S. v. Williams, 963 F.2d 1337 (10th Cir. 1992); United States v. Ciro, 753 F.2d 248 (2d Cir. 1985); United States v. Decker, 543 F.2d 1102 (5th Cir. 1976).
[40] See, e.g., Mills v. Estelle, 552 F.2d 119 (5th Cir. 1977); State v. Butler, 626 S.W.2d 6 (Tenn. 1981); Smith v. United States, 392 A.2d 990 (D.C. 1978); Smith v. State, 795 So. 2d 788 (Ala. Crim. App. 2000).
[41] Van Arsdall, supra note 32, 475 U.S. at 679.
[42] Cheek v. Bates, 615 F.2d 559, 563 (1st Cir. 1980).
[43] Id.
[44] Id.
[45] See id.
[46] Van Arsdall, supra note 32.
[47] Davis, supra note 28.
[48] § 27-608(2).
[49] Brief for appellant in case No. S-07-828 at 27.
[50] See State v. ----, 271 Neb. 698, 715 N.W.2d 531 (2006), cert. denied U.S. ___, 127 S. Ct. 1815, 167 L. Ed. 2d 326 (2007).
[51] State v. Archie, 273 Neb. 612, 733 N.W.2d 513 (2007).
[52] Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1995).
[53] Neb. Evid. R. 402, Neb. Rev. Stat. § 27-402 (Reissue 1995).
[54] State v. Jackson, 275 Neb. 434, 747 N.W.2d 418 (2008).
[55] Gales, supra note 4.
[56] State v. Dunster, 270 Neb. 773, 707 N.W.2d 412 (2005).
[57] Gutierrez, supra note 14.
[58] See State v. Lotter, 255 Neb. 456, 586 N.W.2d 591 (1998).
[59] Brief for appellant in case No. S-07-828 at 29.
[60] See Talkington v. Wotnens Servs, 256 Neb. 2, 588 N.W.2d 790 (1999).
[61] See, Loinaz v. EG & G, Inc., 910 F.2d 1 (1st Cir. 1990); Beary v. City of Rye, 601 F.2d 62 (2d Cir. 1979).
[62] See Parker v. State, 454 So. 2d 910 (Miss. 1984).
[63] Kuehn, supra note 12.
[64] Brief for appellant in case No. S-07-828 at 29.
[65] Talle, supra note 23.
[66] State v. Trammel, 231 Neb. 137, 435 N.W.2d 197 (1989).
[67] See State v. Jackson, 274 Neb. 724, 742 N.W.2d 751 (2007).
[68] See Neb. Rev. Stat. § 29-4019 (Cum. Supp. 2006).
[69] State v. Torres, 254 Neb. 91, 574 N.W.2d 153 (1998).
[70] Neb. Rev. Stat. §§ 29-4001 to 29-4014 (Cum. Supp. 2006).
[71] Torres, supra note 69, 254 Neb. at 95, 574 N.W.2d at 155.
[72] State v. Worm, 268 Neb. 74, 680 N.W.2d 151 (2004).
[73] See § 29-4005(2).
[74] See id.
[75] Worm, supra note 72.
[76] See id. See, also, State v. Schneider, 263 Neb. 318, 640 N.W.2d 8 (2002).
[77] See § 29-4003(1)(a).
[78] See Neb. Rev. Stat. § 83-174.02(1) (Cum. Supp. 2006).
[79] See Torres, supra note 69 (Connolly, J., concurring; Gerrard and Stephan, JJ., join).
[80] See Neb. Rev. Stat. § 83-1,103.04 (Cum. Supp. 2006).
[81] See § 83-174.03(2).
[82] See § 83-174.03(3).
[83] See § 83-174.03(4).
[84] Archie, supra note 51.
[85] Robinson, supra note 50.
[86] State v. Salatnon, 241 Neb. 878, 491 N.W.2d 690 (1992); State v. Sanders, 15 Neb. App. 554, 733 N.W.2d 197 (2007).