## VI. CONCLUSION

The district court did not abuse its discretion in limiting the testimony of one of the expert witnesses and did not err in refusing to give separate jury instructions on the negligence or implied warranty theories of recovery.

Affirmed.

―――――――――――

State of Nebraska, appellee, v.
Patrick L. Cox, appellant.
___ N.W.2d ___

Filed February 11, 2014.    No. A-13-137.

1. **Expert Witnesses: Appeal and Error.** The standard for reviewing the admissibility of expert testimony is abuse of discretion.
2. **Rules of Evidence: Expert Witnesses.** A trial judge acts as a gatekeeper for expert scientific testimony, and must determine (1) whether the expert will testify to scientific evidence and (2) if that testimony will be helpful to the trier of fact. This entails a preliminary assessment whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology may properly be applied to the facts in issue.
3. **Trial: Expert Witnesses.** *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), does not create a special analysis for answering questions about the admissibility of all expert testimony.
4. ____: ____. If a witness is not offering opinion testimony, that witness' testimony is not subject to an inquiry pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).
5. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.
6. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

Appeal from the District Court for Buffalo County: John P. Icenogle, Judge. Affirmed.

John H. Marsh, of Knapp, Fangmeyer, Aschwege, Besse & Marsh, P.C., for appellant.

Jon Bruning, Attorney General, and George R. Love for appellee.

Inbody, Chief Judge, and Moore and Riedmann, Judges.

Inbody, Chief Judge.

## INTRODUCTION

Patrick L. Cox was charged in Buffalo County District Court with strangulation and third degree domestic assault. After a trial on the matter, a jury found Cox guilty on both counts. The district court sentenced Cox to 4 years' probation for the strangulation conviction and to 1 year's imprisonment for the third degree domestic assault conviction, with 7 days' credit for time served. On appeal to this court, Cox assigns error to the district court's determinations regarding expert testimony given by a registered nurse. As such, we limit our review of the facts to those relevant to the assignments of error raised by Cox.

## STATEMENT OF FACTS

Cox and Laura Conner had been in a romantic relationship that lasted approximately 18 months. During that relationship, Cox briefly resided with Conner and her two children from a previous marriage in Conner's home, but Cox moved out of the home when the relationship ended in November 2011. On February 24, 2012, Conner was home with her children when Cox came to her home between 10:30 and 11 p.m. According to Conner, Cox was angry and began yelling at her because she had added male friends to her "Facebook" account and he demanded that she give him her cell phone. Cox lunged at Conner, who was in her bedroom, and she grabbed her cell phone and jumped off of the bed. Cox continued coming toward her with a knife that had been sitting on the kitchen table. Conner grabbed a different knife, which had been in her bedroom next to her cell phone, in reaction to Cox's coming toward her with a knife. Cox attempted to stab at her with the knife he held, which attempts she tried to stop with her cell phone. Conner testified that Cox then grabbed her and threw her against the doorframe, after which he grabbed her throat, slammed her into the bathroom floor, and strangled her until she became unconscious. When Conner regained con-sciousness, Cox was sitting on the edge of the bathtub "going

through [her cell] phone," reading text messages and her "Facebook" account.

Eventually, the police arrived, and the next day, Conner was taken to a hospital. Several photographs that had been taken by the police on the night of February 24, 2012, were received into evidence. Those photographs show significant red marks, bruising, and cuts on Conner's body. Police and hospital personnel testified to observing red marks, bruising, and cuts on Conner, including redness around her neck.

An emergency physician at the hospital examined Conner on February 25, 2012, and testified that Conner had "superficial injuries," but nothing more serious. The doctor testified that Conner told him that she had been "choked," but that she most likely meant that she had been strangled. He observed some "faint redness across the mid to anterior neck," but testified that she did not exhibit other symptoms which he would look for in a patient who had been strangled, such as injury to the airway, sore throat, or subconjunctival hemorrhaging. He testified, to a reasonable degree of medical certainty, that Conner's injuries "possibly could have been due to strangulation."

At trial, Conner explained that on January 3, 2012, a prior incident occurred between herself and Cox, when Cox arrived at her home angry, took her cell phone, and threatened to call her ex-husband to come take her children away. Conner explained that because she could not get her cell phone back from Cox, she opened a pocketknife and threatened to commit suicide in order to get the cell phone back. Conner explained she did not know what else to do in order to get her cell phone back from Cox. Conner testified that once Cox gave Conner her cell phone back, he grabbed her arm, jerked it behind her back, and slammed her face and shoulder into the floor. Conner testified that she believed Cox took those actions to get the knife away from her. Conner further testified that she had been in an abusive relationship with her ex-husband and continued to go to counseling to work on fear, posttraumatic stress disorder, and relationships.

At trial, the State sought to introduce Sue Michalski to the stand as an expert witness, to which Cox objected and

requested a *Daubert* hearing. See *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). At the *Daubert* hearing, Michalski testified that she is a licensed registered nurse who is self-employed in providing expert testimony in domestic assault, strangulation, custody, and sexual assault cases. For 30 years, Michalski had also been the training and education director for a domestic violence coordinating council in Omaha, Nebraska. Michalski was employed as a registered nurse in health and hospice work and "tele-health," as well as a staff nurse in a long-term acute care center. Michalski testified that she had received various types of specialized training related to critical care, strangulation, and domestic violence. As an educator, Michalski had given training sessions and symposiums regarding domestic violence, specifically the dynamics of intimate partner violence from a noninjury perspective to identifying domestic violence injuries. Michalski also testified that she provides training for law enforcement and fire departments, medical students, and hospital personnel in the Omaha and surrounding areas. Michalski testified that through her work, she had articles published twice, had worked with a researcher at a university, and had interviewed over the past 30 years approximately 8,000 to 10,000 victims of domestic violence.

Michalski testified that there were particular characteristics that define victims of interpersonal or domestic violence, including minimization and denial of being in such a relationship, feelings of being trapped, and methodic isolation. Michalski also testified that there are often characteristics of offenders as well, such as getting involved intimately very early on in the relationship, engaging the partner to make them feel good and safe, minimizing and denying accountability for behaviors, exhibiting signs of entitlement such that the offender is actually looking out for the victim, and exhibiting control.

Michalski testified that her methods were accepted within the scientific community, which in her case included "the medical community, the American Medical Association, and International Association of Forensic Nurses, the American Nursing Association, [and] ALSOVER." Michalski further

testified that making a medical diagnosis was not in the scope of her practice as a registered nurse.

Michalski testified that she had neither met with nor interviewed Conner or Cox, but had reviewed police reports and photographs relating to them. Based solely on her review of those materials, Michalski testified that she could not form an opinion as to whether Conner had been the victim of domestic violence by Cox. However, Michalski testified that the pictures of Conner received into evidence did allow her to make an opinion that Conner had been strangled and that it was significant because, in a situation where there is any kind of neck compression, it becomes an immediately potentially lethal situation.

The district court found that Michalski was qualified as an expert, such that

> we had the issue before the Court as to the nature and extent of . . . Michalski's testimony, primarily concerning the general issues involved in domestic violence. It would appear — Counsel for [Cox] has advised the Court that they will be seeking both a self-defense and a lesser-harm instruction concerning the incident in question.
>
>    It would appear to the Court that the testimony of . . . Michalski would be of benefit to the jurors to decide whether or not a domestic abuse relationship existed, and to utilize that determination in determining the intent of [Cox] or the nature of the aggressions between the two parties, both of which are important issues in the self-defense instructions.

In Michalski's trial testimony before the jury, she reiterated all of the educational training and background mentioned above, in addition to discussing the characteristics of both parties involved in domestic violence relationships. At that time, Cox renewed the objection to her testimony made previously at the *Daubert* hearing, which was overruled by the court. Michalski indicated that the scope of her licenses do not include diagnosing medical injuries or making psychiatric or psychological diagnoses. Michalski explained that domestic violence involves the power, control, and balance found within an intimate relationship, indicating that the core issues are

power, control, and methodic isolation. Michalski testified that there is a wide range in the types of control exhibited which often progress to more threatening tactics. Michalski testified that the physical level of controlling behavior most often occurs "when the person offending [sic] the other person feels like their power is being taken away from them."

Michalski testified that initially, offenders will present in the relationship as being very kind, nice, and entertaining, and that as the relationship progresses, the offender discovers what is important to the victim and isolates the victim from those things, which often include family, children, faith, finances, and even animals. Michalski testified that victims often feel powerless, let down, and to blame, while the offenders often feel as though they "can do no wrong," such that they are the "center of the universe and everything revolves around [them]." Michalski also testified that there is often a "public [and] private face" and that the offender will often cast himself or herself as a victim in order to put the offender in a positive light.

Michalski further testified about strangulation and how the act of strangulation is generally carried out. Michalski testified that the medical signs and symptoms of strangulation varied depending on the condition, size, and age of the victim. Michalski testified that initially there is not a lot of outward appearance, but that there could be "redness," "petechial hemorrhage," loss of consciousness, "pain in [the] neck area," headache, difficulty swallowing or speaking, vomiting, or the occurrence of urination or a bowel movement, and that strangulation is potentially lethal. Michalski testified that many times, victims will not report to having been strangled, because they do not feel as though they have sustained a type of injury requiring diagnosis, and that due to the loss of oxygen, victims can sometimes suffer from a loss of memory. Michalski testified that she had not met or interviewed either Cox or Conner and did not have any opinion specifically with regard to their circumstances.

Cox testified in his own behalf, indicating, as did Conner, that the two were involved in a romantic relationship. Cox testified that the relationship began to have issues when he had

been gone frequently to complete "training with the National Guard." In November 2011, Cox moved out of the home which he and Conner had been residing in. Cox testified that Conner's father told him the relationship was over, but that he continued to correspond with Conner and moved back into the home in late December through January 2012. Cox testified that he decided to give Conner some time to get through her divorce from her ex-husband, paid her rent for February, continued to support her and her children, but rented his own apartment as well. Cox testified that he continued to help Conner by fixing dinner for her and her children and by washing dishes. Cox testified that on January 30, he and Conner got into a fight because he was "hanging out with [another] girl" and he then accused her of cheating and asked to see her cell phone. Cox testified that she gave him her cell phone, he began to "look[] through it," and Conner got mad and began to "throw a temper tantrum." Cox testified that he had previously given Conner a "cold-steel knife" he had purchased on his last deployment to Iraq and that she pulled it out of her purse, threatened to hurt him, and then threatened to kill herself. Cox testified that he immediately ran at Conner, pulled the knife away from her neck, and threw her to the ground. Cox testified that he was trained "in the Marine Corps" on how to take knives away from people. Cox testified that after that incident, he no longer stayed with Conner, although he retained a key to her home so that he could go there when she was not home.

Cox testified that earlier in the day on February 24, 2012, he and Conner had been text messaging back and forth and he had asked her about "all the guys she had on Facebook." Cox testified that Conner got defensive about one of those men and that he became curious. Cox testified that because Conner had never specifically ended the relationship, he wanted to know if he had any reason to stay around as Conner's boyfriend and continue to pay her rent.

Cox testified that at approximately 10:30 p.m. on February 24, 2012, he went to Conner's home and unlocked the door with his key, but that he did not knock or ring the doorbell because her children were sleeping. Cox testified that he

went to the home to apologize, but that he raised the issue of the other men again with Conner. Cox asked to see her cell phone to make sure there was nothing going on with another man, and Conner became upset. Cox testified that there was a knife on the headboard of the bed and that he was going to place it on the dresser, when he saw Conner in the bathroom holding a knife. Cox testified that he had previously taught Conner how to defend herself with a knife, so he moved toward her, grabbed her knife hand, and pushed her through the bathroom door so that he could pull the knife away from her. Cox testified that he tossed his knife into the bathtub after he grabbed Conner's hand. Cox testified that Conner was trying to "slash at [his] face and [his] throat and [his] organs" with the knife.

Cox testified that he pushed Conner to the bathroom floor and straddled her while trying to get the knife away from her. Cox testified that Conner was "clawing at [him]" with her free arm, that he tried to pin that arm down with his leg, and that he then put his right hand on her throat and applied pressure for about 4 seconds until she started to "black out." Cox testified that when she began to "black out," he "ripped the knife out of her hands" and threw it into the bathtub with the other knife. Cox testified that he grabbed Conner's throat because she was going to hurt him. Cox testified that once Conner regained consciousness, he continued to restrain her, although she was screaming and trying to get him off of her. Cox testified that he did not want Conner to wake up the children, so he continued to pin her arms down with his legs and applied pressure to her throat again, this time with both hands. Cox testified that he "choked her out again." Cox explained, "I applied just enough pressure so that she would pass out, but not to kill her. And I applied just enough pressure so that I wouldn't crack her trachea, I wouldn't completely cut off the blood flow to her brain." Cox testified that when she regained consciousness a second time, she began crying and asked for her inhaler, so he got off of her, and that she immediately apologized to him and told him she loved him.

On cross-examination, Cox testified that he "deemed it necessary" to strangle her twice, even though she weighed

approximately 115 pounds and he was "a 219-pound U.S. Marine," and that although she had previously on one occasion threatened suicide, she did not do so on this evening.

The matter was submitted to the jury, which returned unanimous guilty verdicts on both counts. The district court later sentenced Cox to 4 years' probation for the strangulation conviction and 1 year's imprisonment for the third degree domestic assault conviction, with 7 days' credit for time served.

## ASSIGNMENTS OF ERROR

Cox assigns that the district court erred by admitting the testimony of the State's expert witness, Michalski; by overruling his *Daubert* objection, see *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); and by overruling his objection based on Neb. Rev. Stat. § 27-403 (Reissue 2008).

## ANALYSIS

All three of Cox's assigned errors revolve around the testimony given by Michalski regarding domestic violence. Cox argues that her testimony should have been excluded under the principles of *Daubert* and that her testimony regarding strangulation should have been excluded under § 27-403.

[1] The standard for reviewing the admissibility of expert testimony is abuse of discretion. *State v. McClain*, 285 Neb. 537, 827 N.W.2d 814 (2013); *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012).

Daubert *Hearing*.

Cox argues that Michalski's testimony should have been excluded because it does not meet the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra*, which standards were adopted by the Nebraska Supreme Court in *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001).

[2] A trial judge acts as a gatekeeper for expert scientific testimony, and must determine (1) whether the expert will testify to scientific evidence and (2) if that testimony will be helpful to the trier of fact. See *id*. This entails a preliminary assessment whether the reasoning or methodology underlying

the testimony is scientifically valid and whether that reasoning or methodology may properly be applied to the facts in issue. See *id*.

Cox argues that Michalski's testimony fails to meet the standards required by *Daubert* because her theory unfairly cast Cox as the abuser and deprived him of a just result. We disagree with Cox's argument.

[3,4] The Nebraska Supreme Court has found that *Daubert* does not create a special analysis for answering questions about the admissibility of all expert testimony. See *State v. Schreiner*, 276 Neb. 393, 754 N.W.2d 742 (2008). If a witness is not offering opinion testimony, that witness' testimony is not subject to an inquiry pursuant to *Daubert*. *State v. Schreiner, supra*; *State v. Robinson*, 272 Neb. 582, 724 N.W.2d 35 (2006), *abrogated on other grounds, State v. Thorpe*, 280 Neb. 11, 783 N.W.2d 749 (2010).

In *State v. Schreiner, supra*, the defendant sought, through a *Daubert* argument, to exclude the expert witness testimony of a sexual assault nurse examiner who performed an examination of the victim, but did not offer any specific opinion as to what caused the injuries observed during the examination. The court found that the witness testified regarding observations about the victim and that although she was qualified to offer expert testimony, she testified to matters within her personal knowledge. *Id*. The court concluded that "this is simply not the sort of expert testimony that demands a *Daubert* inquiry." *State v. Schreiner*, 276 Neb. at 405, 754 N.W.2d at 754. See, also, *State v. Robinson, supra*; *Sedlak Aerial Spray v. Miller*, 251 Neb. 45, 555 N.W.2d 32 (1996) ("expert witness" who testified about flying was testifying not as to opinions based upon his expertise, but as to personal knowledge).

Although *State v. Roenfeldt*, 241 Neb. 30, 486 N.W.2d 197 (1992), was decided prior to the *Daubert/Schafersman* line of cases, it is also instructive. In *State v. Roenfeldt, supra*, the defendant objected to the expert testimony of a physician who testified to the symptoms, behavior, and feelings generally exhibited by children who had been sexually abused. That expert testimony was not premised upon an examination of the victim, and the expert did not testify as to whether the

victim had been sexually abused. The Nebraska Supreme Court found that the testimony was admissible because it assisted the trier of fact in understanding and determining the issues related to the case. *Id.*

Assuming without specifically deciding whether Michalski's testimony necessitates a *Daubert* analysis, we find that the nature of Michalski's testimony regarding domestic abuse relationships and common characteristics of both abusers and victims was helpful to the jury because it assisted them in understanding and determining the issues closely related to the case. See *State v. Roenfeldt,* s*upra.* Therefore, the trial court did not abuse its discretion by overruling Cox's motion to exclude Michalski's testimony.

### Objection Under § 27-403 and Strangulation Testimony.

Cox argues that Michalski's specific testimony regarding strangulation should have been excluded under § 27-403 because her testimony of the definition of strangulation differed from the definition set forth under Nebraska laws. The State contends that, at trial, the § 27-403 objection was not raised regarding strangulation, but only later when Michalski was questioned as to why a victim may threaten self-harm.

[5,6] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Kibbee*, 284 Neb. 72, 815 N.W.2d 872 (2012). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Kibbee, supra.*

The record indicates that, contrary to Cox's assertion in his brief that a § 27-403 objection was made at the *Daubert* hearing, no specific § 27-403 objection was made until Michalski's trial testimony in front of the jury and was regarding a victim's threat of self-harm as follows:

> [The State:] Michalski, let me paint a hypothetical picture for you. If a domestic violence victim had just been

— if her telephone, if her cell phone had just been taken from her and she wanted it back, and the offender refused to give it back, and the victim, in response, threatened to harm herself, what do you make of that?

[Cox's counsel]: Object on relevancy and [§ 27-]403.

THE COURT: Sustained.

[The State:] If a victim threatened self-harm under a crisis-type situation, or something she perceived as a crisis, could you explain her rationale for doing so?

[Cox's counsel]: I'd make the same objection, Judge; [§ 27-]403.

THE COURT: Overruled. You may answer.

With regard to testimony given regarding strangulation, the following colloquy occurred between the State and Michalski at trial, before the above-mentioned testimony and specific § 27-403 objections:

Q . . . Michalski, I'm going to switch gears now and ask you about strangulation.

A Okay.

Q Can you define strangulation for us?

A Yes. Strangulation is pressure placed on the vessels of the neck and the airway.

[Cox's counsel]: I'm going to pose an objection. I believe that strangulation is a defined term under Nebraska law.

[Michalski]: Yes, it is.

THE COURT: Overruled. You may proceed.

A It's — by pressure, what that pressure does is it impedes or blocks the blood flow and the air flow to and from the brain, the heart and the rest of the system.

As indicated in the excerpts from Michalski's trial testimony, Cox did not specifically object to the strangulation testimony under § 27-403. However, even though Cox did not explicitly identify § 27-403 as his objection, his reference to strangulation as a legally defined term is sufficient for us to address the assignment of error under § 27-403.

Section 27-403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of

the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

Neb. Rev. Stat. § 28-310.01(1) (Reissue 2008) provides that "[a] person commits the offense of strangulation if the person knowingly or intentionally impedes the normal breathing or circulation of the blood of another person by applying pressure on the throat or neck of the other person." Michalski started to define strangulation as "pressure placed on the vessels of the neck and the airway," during which Cox interposed an objection. Once the objection was overruled, Michalski continued with her definition, explaining that "[i]t's — by pressure, what that pressure does is it impedes or blocks the blood flow and the air flow to and from the brain, the heart and the rest of the system."

Michalski's complete definition of strangulation is almost identical to the statutory definition set forth in § 28-310.01, and its probative value is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Therefore, we conclude that the district court did not abuse its discretion by overruling Cox's objection to Michalski's testimony regarding strangulation.

For completeness in addressing Cox's arguments contained within this assignment of error, we also note that Cox briefly alleges that Michalski's testimony improperly characterized him as an offender. The record indicates that Michalski, throughout her testimony at both the *Daubert* hearing and testimony before the jury, specifically referred to the abuser in a domestic violence relationship as an offender and to the person receiving the abuse as a victim, with not one objection as to that characterization. Specifically, before the jury, the State indicated to Michalski that "for simplicity, we will call those people victims, and the opposite party, offenders. Fair enough?" Michalski replied, "Yes."

No objection was ever made regarding the terminology used by Michalski, and therefore, Cox has waived any objection to its use. See *State v. Nadeem*, 284 Neb. 513, 822 N.W.2d 372 (2012) (failure to make timely objection waives right to assert prejudicial error on appeal).

CONCLUSION

In conclusion, we find that the trial court did not abuse its discretion by allowing Michalski to testify as an expert over Cox's objection and allowing her testimony regarding strangulation over his objection. Therefore, we affirm.

AFFIRMED.

---

Mark J., appellee, v. Darla B., formerly
known as Darla J., appellant.
___ N.W.2d ___

Filed February 11, 2014.    No. A-13-394.

1. **Modification of Decree: Appeal and Error.** Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and which will be affirmed absent an abuse of discretion by the trial court.

2. **Divorce: Modification of Decree: Visitation.** Visitation rights established by a marital dissolution decree may be modified upon a showing of a material change of circumstances affecting the best interests of the children.

3. **Modification of Decree: Words and Phrases.** A material change in circumstances means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently.

4. **Visitation.** The party seeking to modify visitation has the burden to show a material change in circumstances affecting the best interests of the child.

5. **Visitation: Parent and Child.** Visitation relates to continuing and fostering the normal parental relationship of the noncustodial parent with the minor children of a marriage which has been legally dissolved.

6. **Visitation.** The best interests of the children are primary and paramount considerations in determining and modifying visitation rights.

7. **Evidence: Appeal and Error.** When the evidence is in conflict, an appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another.

8. **Courts: Child Custody: Visitation.** It is the responsibility of the trial court to determine questions of custody and visitation of minor children according to their best interests, which is an independent responsibility and cannot be controlled by the agreement or stipulation of the parties or by third parties.

Appeal from the District Court for Garfield County: Karin L. Noakes, Judge. Affirmed in part, and in part reversed and remanded for further proceedings.