IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE V. TORRES AQUINO

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

NIMROD TORRES AQUINO, APPELLANT.

Filed August 20, 2024.    No. A-23-596.

Appeal from the District Court for Hall County: PATRICK M. LEE, Judge. Affirmed.

Jerrod Jaeger, of Jaeger Law Office, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Jordan Osborne for appellee.

PIRTLE, Chief Judge, and ARTERBURN and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Nimrod Torres Aquino (Appellant), appeals from his jury convictions for first degree sexual assault of a child and third degree sexual assault of a child. He argues that the district court erred in finding that he violated the district court's discovery order; that the court erred in overruling his motion in limine regarding prior bad acts; that the cumulative effect of the district court's evidentiary errors deprived him of his right to a fair trial; and that his trial counsel was ineffective. For the reasons stated herein, we affirm.

## II. STATEMENT OF FACTS

### 1. BACKGROUND

In April 2022, the State charged the Appellant with first degree sexual assault of a child, a Class IB felony, under Neb. Rev. Stat. § 28-319.01(1)(b) (Reissue 2106) and third degree sexual

assault of a child, a Class IIIA felony, under Neb. Rev. Stat. § 28-320.01 (Reissue 2016). The charges arose after T.G.T., the Appellant's stepdaughter, disclosed that the Appellant had been sexually assaulting her.

2. DISCOVERY

The Friday before the trial was scheduled to begin, defense counsel filed a motion for a subpoena duces tecum for Dr. Carmen Partida and medical records pertaining to T.G.T. that were in her possession. The State filed a motion to quash asserting that the subpoena called for the production of privileged doctor/patient records and that the Appellant was attempting to circumvent the requirements of *State v. Trammell*, 231 Neb. 137, 435 N.W.2d 197 (1989).

During a status hearing, the State asserted that it was not familiar with Dr. Partida, that the State did not receive any medical records from the defense in discovery, that the State did not provide any medical records in discovery, that the State had never seen the medical records nor was it aware that Dr. Partida performed a medical examination on T.G.T., that defense counsel did not include Dr. Partida's name on its witness list in discovery, and that defense counsel should have disclosed the records to the State pursuant to the reciprocal discovery agreement. The State requested that the court exclude the testimony and the records of Dr. Partida and in the event that the court found that the records were necessary for the defense to adequately present its case, the State requested a continuance of the trial.

In response, defense counsel indicated that the medical records were "given to me, Judge. That is what I have in my trial notebook." When asked how defense counsel obtained a copy of the medical records, defense counsel stated, "Judge, in the massive discovery that I have, there were documents there. I don't know whether it came from previous counsel or where they came from. I just know that when we put our trial notebook together, I have those documents in my trial notebook." Defense counsel argued that T.G.T. was taken for a medical examination at law enforcement's request, that T.G.T.'s mother took her to the hospital following the disclosure of the alleged sexual assaults, that the State conducted multiple interviews with T.G.T.'s mother, and that defense counsel believed that he had received the medical records from the State. As a result, defense counsel argued that the fact that a medical examination occurred should not be a surprise to the State. Defense counsel sought to elicit testimony from Dr. Partida that T.G.T. went to the hospital on March 25, 2022, and reported to Dr. Partida that the last penetrative sexual assault had occurred 4 months prior. Defense counsel, in his subpoena, requested Dr. Partida also provide her medical records to refresh her recollection if necessary. The State's information initially alleged that the sexual assault had occurred between February 1 and February 24, 2022. Defense counsel indicated that the date that the last sexual assault occurred as reported by T.G.T. to Dr. Partida would predate the State's charged occurrence.

Following a hearing, the district court entered an order stating:

As further explained on the record, the [Appellant] failed to provide the medical record, Exhibit 1, or the identity of Dr. Carmen Partida to the State prior to May 5 for a jury trial beginning on May 8, in violation of the Court's reciprocal discovery order. Based upon the significance of the violation, the Court, pursuant to the guidance in *State v. Sierra*, 305 Neb. 249 (2020) and in accordance with Neb. Rev. Stat. § 29-1919, as a sanction for this

discovery violation shall prohibit Dr. Partida from being called as a witness by the [Appellant.]

### 3. Motion in Limine

The Appellant filed a motion in limine to exclude evidence of sexual assaults against T.G.T. that had occurred more than a year prior to the assault allegations in Nebraska. The district court found that the evidence was admissible because the prior alleged sexual assaults were inextricably intertwined with the charged offenses.

### 4. Trial

The trial was held over several days in May 2023. Testimony was adduced witnesses including Alejandro D., T.G.T.'s prior boyfriend; Jami Barrientos, a middle school counselor; T.G.T.'s mother; Grand Island Police Investigator Timothy Champion; and T.G.T.

Evidence was adduced during the trial that in February 2022, T.G.T. disclosed that the Appellant had been sexually assaulting her since approximately 2019. T.G.T. testified that the sexual abuse first started when she was 11 years old when she and her family resided in Puerto Rico. The Appellant began a relationship with T.G.T.'s mother and, in November 2018, he moved in with T.G.T., her mother, and her brother. The Appellant and T.G.T.'s mother married approximately 4 months later, and the family continued residing together until October 2020 when the Appellant moved to California for work. Although T.G.T.'s mother joined the Appellant a month later, both T.G.T. and her brother remained in Puerto Rico until January 2021, at which time they joined their mother and the Appellant in California.

The evidence established that both the Appellant and T.G.T.'s mother worked for a company doing sanitation and cleaning work. T.G.T.'s mother testified that the company moved them around where they needed them, and as a result, they lived in multiple states over a short period of time in hotels paid for by the company. Between January and December 2021, the family moved approximately eight times, living in hotels, before moving to Grand Island, Nebraska, on December 1, 2021. After the family moved to Nebraska, T.G.T. testified that the Appellant had sexually assaulted her on numerous occasions, including penile-vaginal penetration. T.G.T. initially disclosed the sexual abuse to her boyfriend at the time, Alejandro, who reported it to a teacher at school. The school then contacted the child abuse hotline. After that report, Investigators Timothy Champion and Christopher Marcello contacted T.G.T. and she was taken to the Child Advocacy Center (CAC) for a forensic interview. During the interview, T.G.T. disclosed that the Appellant had sexually assaulted her. Following T.G.T.'s interview, the Appellant and T.G.T.'s mother arrived at CAC. T.G.T. was released to her mother's care and the Appellant was detained and transported to the law enforcement center for an interview.

During the law enforcement interview, the Appellant made comments about T.G.T.'s body development and how "she didn't have the body of somebody her age"; that T.G.T.'s menstrual cycle had been irregular in that "she went three months without having a menstrual cycle in the past"; and that it was his responsibility to ensure T.G.T. bathed and that he told T.G.T. "to leave the bathroom door open."

During a subsequent interview with T.G.T.'s mother, she provided investigators with a video recording of a conversation between her and T.G.T. That recording was not offered as evidence during the trial. Following that interview, investigators attempted to schedule a second forensic interview with T.G.T. but T.G.T.'s mother did not return their calls. Prior to trial, T.G.T. was removed from her mother's care.

(a) T.G.T.'s Testimony

T.G.T. reported that the Appellant subjected her to oral sex and penile-vaginal penetration in several different states including California, Utah, North Carolina, Idaho, Washington, and Nebraska. T.G.T. testified that her mother married the Appellant when they were living in Puerto Rico and that they lived there until she was about 12 years old. Thereafter, the Appellant and T.G.T.'s mother moved to California and T.G.T. and her brother later joined them. T.G.T. testified that her mother and the Appellant moved around a lot for work but that they eventually settled in Grand Island, Nebraska. She stated that she was enrolled in school where she met Alejandro, who later became her boyfriend. T.G.T. testified that she and Alejandro were in the same program at school for students learning English and they spoke during school and outside of school using Tik Tok. T.G.T. stated that she trusted Alejandro and that eventually she disclosed to him that the Appellant "was raping me" and that the Appellant was "always waiting for my mom to be out of the house for him to take advantage of me." T.G.T. testified that she did not tell anyone else until the police spoke to her.

T.G.T. testified that the Appellant began assaulting her when she was 11 years old in Puerto Rico after the Appellant married her mother. T.G.T. testified that the Appellant first sexually assaulted her in the bathroom of their house while T.G.T.'s mother and brother were not home. She stated that the Appellant was in the shower and told her that he needed help. When she entered the bathroom, the Appellant "told me I had to masturbate him so that he didn't have pain anymore." She stated that the Appellant made her touch his penis with her hand until "a disgusting liquid came out of his private part." T.G.T. testified that the Appellant told her not to tell anyone and he threatened harm to T.G.T., her mother, or her brother. She stated that the sexual abuse continued while they were living in Puerto Rico. T.G.T. also recounted another incident that occurred when the family was living with the Appellant's sister. During that incident, she and the Appellant were alone in the home when the Appellant told her to go into the bathroom. After she entered the bathroom, the Appellant shut the door and "he told me to masturbate him as I normally did, but that time, he told me. . . to do it different because according to him, I was already very good at doing it with my hands. He told me there was a different way to do it with my mouth." T.G.T. testified that the Appellant showed her a pornographic video on his phone to show her how to do it. Thereafter, T.G.T. testified that the Appellant made her "suck his penis" with her mouth and "he came inside my mouth, and then let me go out of the room as if nothing had happened."

T.G.T. testified that the assaults continued after the family moved to California. She stated that the first time it occurred was in the bathroom of a hotel. She testified that the Appellant came into the bathroom while she was in the shower and said "do you remember what I showed you what to do?" She testified that he made her masturbate him with her hands and her mouth. T.G.T. testified that, although her mother was not present, her brother was present but the Appellant gave

T.G.T.'s brother a cell phone to distract him. T.G.T. testified that the incidents continued when the family moved to North Carolina where they lived with their great aunt. She testified that the Appellant removed her shorts and underwear then "put his penis inside of my vagina" and "he raped me." T.G.T. testified that it continued until he ejaculated on her back. Although T.G.T.'s great aunt was home during the incident, T.G.T. testified that she did not tell her great aunt because she was afraid that she would not be believed. T.G.T also stated that she did not tell her mother because her mother "thought that I was a whore" because the Appellant told her mother that T.G.T. was doing "incorrect things" with her boyfriend and that he "suspected that [T.G.T.] was having sex with other people."

Regarding incidents occurring in Grand Island, Nebraska, T.G.T. testified that she believed that the incidents initially started about a week after they moved into their house. According to T.G.T., incidents occurred at their house in Grand Island where the Appellant made her masturbate him with her hands. She testified to another incident where the Appellant walked into the bathroom while she was taking a shower and "made me look at what supposedly I had provoked" because "according to him, the clothes that I had on enticed him or excited him." T.G.T. testified that the Appellant then proceeded to get in the shower with her. T.G.T. testified that the Appellant made her masturbate him with soap on her hand and that when she finished masturbating him, "he started to bathe my body." T.G.T. stated that the Appellant touched her "boobs" and "rear end" and "then he got on his knees and he said, I want to try something." T.G.T. testified that that the Appellant "opened my legs and then he put his mouth on my vagina" after which he penetrated her vagina with his penis and ejaculated in her hand. T.G.T. testified that "afterwards I had to lick it" off "my hand." The following day, T.G.T. disclosed the assault to Alejandro on Tik Tok and about a week later the police contacted her at her school.

### (b) Alejandro's Testimony

Alejandro testified that T.G.T. disclosed to him on Tik Tok that she was being "violated at home." He testified that T.G.T. did not indicate what she meant by violated. He stated that he deleted the Tik Tok messages and T.G.T. did not speak to him again. He testified that the day after T.G.T.'s disclosure, he told a teacher "[t]hat I knew somebody that was having some problems at home, that she was being – I apologize for the word – violated." Alejandro identified T.G.T. as the source of the report and, at some point thereafter, law enforcement spoke to Alejandro at his home.

### (c) T.G.T.'s Mother's Testimony

T.G.T.'s mother testified that in March 2022, she took T.G.T. to the hospital for a medical examination and subsequently provided that report to the investigators.

According to T.G.T.'s mother, T.G.T. had a reputation for untruthfulness. She further testified that, from January 2021 when the children moved in with them in California until February 10, 2022, she and the Appellant worked for the same company working the same shift; that the family always went shopping together; and that, during that period of time, the Appellant had not been alone with T.G.T. for longer than 5 minutes.

T.G.T.'s mother also testified that after moving to Nebraska, she and the Appellant both started working the same shift at Walmart. T.G.T.'s mother testified that on February 10, 2021,

she started a new job and that this was the first time that she worked a different shift than the Appellant since January 2021. At the time of trial, T.G.T.'s mother acknowledged that she and the Appellant were still married and resided together.

## 5. JURY VERDICT AND SENTENCING

After hearing the evidence, the jury returned a guilty verdict on both counts. During the sentencing hearing, the court indicated that it had considered the presentence investigation report (PSR) and the appropriate sentencing factors. The court specifically noted that the Appellant failed to take responsibility for his actions, that the Appellant indicated during the PSR interview that he did not intend to follow any recommended level of treatment or comply with the mandatory requirements of the sex offender registration, that the Appellant had fled from justice and had a previous conviction in Puerto Rico, and that the Appellant posed a significant threat to adolescent females who he can easily gain access to and have influence over by exerting power and control.

The district court sentenced the Appellant to 45 to 60 years' imprisonment for first degree sexual assault of a child and 1 to 3 years' imprisonment for third degree sexual assault of a child. The sentences were ordered to run concurrently and the Appellant was given credit for 119 days for time served. The Appellant has timely appealed his conviction and sentence represented by new counsel on appeal.

## III. ASSIGNMENTS OF ERROR

The Appellant assigns, renumbered and restated, that: (1) the district court erred in determining that he had committed a discovery violation for failing to disclose Dr. Partida and the documentation in exhibits 1 and 2; (2) that the district court erred in overruling his motion in limine and admitting evidence of prior bad acts, which deprived him of his right of confrontation and right to a fair trial; (3) that the cumulative effect of the errors committed by the trial court resulted in a deprivation of his right to a fair trial; and (4) that he received ineffective assistance of counsel when counsel: (a) failed to disclose Dr. Partida and the documentation in exhibits 1 and 2 resulting in a discovery violation; (b) failed to move for sanctions against the State for late produced discovery and a continuance within which to pursue a *Trammell* motion for disclosure of T.G.T.'s counseling records; and (c) failed to investigate and present evidence about sexually transmitted diseases.

## IV. STANDARD OF REVIEW

Trial courts have broad discretion with respect to sanctions involving discovery procedures, and their rulings thereon will not be reversed in the absence of an abuse of discretion. *State v. Case*, 304 Neb. 829, 937 N.W.2d 216 (2020).

Because a ruling on a motion in limine is not a final ruling on the admissibility of evidence and does not present a question for appellate review, a question concerning the admissibility of evidence which is the subject of a motion in limine is raised and preserved for appellate review by an appropriate objection or offer of proof during trial. *State v. King*, 316 Neb. 991, 7 N.W.3d 884 (2024).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Anders*, 311 Neb. 958, 977 N.W.2d 234 (2022). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Id.*

Whether cumulative error deprived a criminal defendant of his or her Sixth Amendment right to a trial by an impartial jury presents a question of law to be reviewed de novo. *State v. Figures*, 308 Neb. 801, 957 N.W.2d 161 (2021).

Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. *State v. Stelly,* 304 Neb. 33, 932 N.W.2d 857 (2019). An appellate court determines as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance. *Id*.

## V. ANALYSIS

### 1. Discovery Sanction

The Appellant first assigns that the trial court erred in determining that the defense committed a discovery violation by failing to disclose Dr. Partida and the medical records in exhibits 1 and 2. The Appellant's assignment relates to his request to subpoena Dr. Partida for trial along with his request for Dr. Partida to bring T.G.T.'s medical records with her. The State moved to quash the subpoena and requested the court enter an order precluding the Appellant from calling Dr. Partida due to the defense's failure to disclose her as a witness and disclose her report pursuant to the terms of the court's reciprocal discovery order.

Following a hearing, the trial court issued an order which provided:

As further explained on the record, the [Appellant] failed to provide the medical record, Exhibit 1, or the identity of Dr. Carmen Partida to the State prior to May 5 for a jury trial beginning on May 8, in violation of the Court's reciprocal discovery order. Based upon the significance of the violation, the Court, pursuant to the guidance in *State v. Sierra*, 305 Neb. 249 (2020) and in accordance with Neb. Rev. Stat. § 29-1919, as a sanction for this discovery violation shall prohibit Dr. Partida from being called as a witness by the [Appellant].

The Appellant claims that the district court erred in making this ruling. In that regard, the Appellant argued to the trial court and to this court:

At the May 5, 2022, hearing, trial counsel represented to the court that the intent behind subpoenaing Dr. Partida was for the witness to testify that T.G.T. went to the hospital and reported to the witness that the alleged sexual assault occurred four months prior to the date of the report, which was March 25, 2022. . . . The only purpose for bringing the witness to bring documents was for her to be able to refresh her recollection, if necessary.

- 7 -

Brief for appellant at 17.

The trial court's specific order from the pretrial hearing precluded the Appellant from calling Dr. Partida. The order did not preclude the Appellant from attempting to offer the report or in asking T.G.T. about whether she made the statement to Dr. Partida regarding the timing of the last assault. Nor did the Appellant attempt to call Dr. Partida or make an offer of proof of what Dr. Partida would testify to at trial.

As the Nebraska Supreme Court recently held in *State v. King*, 316 Neb. 991, 997, 7 N.W.3d 884, 890 (2024):

> Interpreting § 27-103(1)(b), we have said that in order to predicate error upon a ruling of the court refusing to permit a witness to testify, or to answer a specific question, the record must show an offer to prove the facts sought to be elicited. See *State v. Schreiner*, 276 Neb. 393, 754 N.W.2d 742 (2008). Such an offer of proof must be made at trial. See *id.* A motion in limine is only a procedural step to prevent prejudicial evidence from reaching the jury. *Id.* It is not the office of such motion to obtain a final ruling upon the ultimate admissibility of the evidence. *Id.* Because a ruling on a motion in limine is not a final ruling on the admissibility of evidence and does not present a question for appellate review, a question concerning the admissibility of evidence which is the subject of a motion in limine is raised and preserved for appellate review by an appropriate objection or offer of proof during trial. See *id.*

Because the Appellant made no attempt during trial to question T.G.T. about the alleged statement she made to Dr. Partida and did not present an offer of proof at trial of what Dr. Partida would have testified to if allowed to testify, this issue simply was not preserved for appellate review and this assignment of error fails.

### 2. APPELLANT'S MOTION IN LIMINE

The Appellant assigns that the district court erred in overruling his motion in limine and allowing the State to adduce evidence of prior bad acts based upon the court's finding that the prior occurrences of alleged sexual assaults against T.G.T. were inextricably intertwined with the charged crime. He asserts that the admission of the evidence violated his right of confrontation and his right to a fair trial. More specifically, he argues that the State did not file a pretrial "motion asking for a determination of whether the evidence was inextricably intertwined with the charged conduct or admissible under Neb. Rev. Stat. § 27-404(2) [(Cum. Supp. 2022)] or Neb. Rev. Stat. § 27-414 [Reissue 2016)]." Brief for appellant at 22.

Under § 27-414, evidence of other similar crimes in sexual assault cases is admissible against the defendant if there is clear and convicting evidence that the accused committed the other offense or offenses. Rule 414 also requires the State to provide notice to the accused at least 15 days before trial and requires the court to conduct a hearing outside the presence of the jury to determine the admissibility of the other similar acts. However, § 27-404, and by extension, § 27-414 do not apply to evidence of a defendant's other crimes or bad acts if the evidence is inextricably intertwined with the charged crime. See *State v. Kelly*, 20 Neb. App. 871, 835 N.W.2d 79 (2013). This rule includes evidence that forms part of the factual setting of the crime, or

- 8 -

evidence that is so blended or connected to the charged crime that proof of the charged crime will necessarily require proof of the other crimes or bad acts, or if the other crimes or bad acts are necessary for the prosecution to present a coherent picture of the charged crime. *Id*.

The Nebraska Supreme Court, in *State v. Kelly*, 20 Neb. App. at 882, 835 N.W.2d at 88, explained:

> """"Where evidence of other crimes is "so blended or connected, with the one[s] on trial [so] that proof of one incidentally involves the other[s]; or explains the circumstances; or tends logically to prove any element of the crime charged," it is admissible as an integral part of the immediate context of the crime charged. When the other crimes evidence is so integrated, it is not extrinsic and therefore not governed by [r]ule 404 . . . . As such, prior conduct that forms the factual setting of the crime is not rendered inadmissible by rule 404. . . . The State is entitled to present a coherent picture of the facts of the crime charged, and evidence of prior conduct that forms an integral part of the crime charged is not rendered inadmissible under rule 404 merely because the acts are criminal in their own right, but have not been charged. . . . A court does not err in finding rule 404 inapplicable and in accepting prior conduct evidence where the prior conduct evidence is so closely intertwined with the charged crime that the evidence completes the story or provides a total picture of the charged crime. . . .'"""
>
> *State v. Robinson*, 271 Neb. 698, 714, 715 N.W.2d 531, 549 (2006).
>
> We do not read rule 414 to change the law regarding acts which are inextricably intertwined to the charged offenses. Because they were not considered extrinsic and therefore not subject to rule 404 before, they are not extrinsic and not subject to rule 414 now. As a result, even though evidence of prior sexual assaults may be considered prior bad acts, a hearing under rule 414 is not required if this evidence forms the factual setting of the charged offenses and is necessary to present a complete and coherent picture of the facts.

Our precedent shows that the Nebraska Supreme Court has upheld the admission of evidence under the inextricably intertwined rule when the defendant's other bad acts showed his pattern of sexually abusing a child or exposing the child to sexually explicit material. *State v. Lee*, 304 Neb. 252, 934 N.W.2d 145 (2019). Further, because Rule 404 does not apply to other acts that are inextricably intertwined with the charged crime, and by extension Rule 414, the court was not required to conduct a hearing. See *id*.

In this case, the State argued that the alleged assaults occurring prior to the Appellant's and T.G.T.'s arrival in Grand Island on December 1, 2021, showed a continuous course of conduct from the time that the Appellant moved in with T.G.T.'s mother in Puerto Rico and continuing at each location to which the family moved. The district court overruled appellant's motion in limine "given the ruling in *State v. Lee*" finding that the evidence was inextricably intertwined with the charged crime and that the out-of-state sexual assault evidence was integral to the development of an accurate timeline. Therefore, the court found that Rule 404 and Rule 414 analysis did not apply. The Appellant argues that the evidence of other alleged sexual assaults against T.G.T. that occurred

- 9 -

in other jurisdictions were not admissible because the State failed to file a pretrial motion in order to determine the admissibility of the other alleged assaults outside the presence of the jury.

However, because the allegations involve the same victim and blend into the narrative of the events, they are not "prior bad acts" or "evidence of similar crimes." Rather, the other alleged occurrences form the context and pattern of the sexual assault charged by the State via information. Therefore, the State was not required to file a motion under § 27-404 or § 27-414 to provide notice to the Appellant of its intent to offer evidence of the Appellant's continuous course of conduct assaulting T.G.T. over a period of time and in places where they lived prior to moving to Nebraska. The Appellant further argues that discovery violations also failed to give him "a complete picture of the prior acts evidence in this case"; however, the Appellant does not separately assign error to any alleged discovery violations or the court's rulings on the alleged discovery violations. This assignment fails.

### 3. CUMULATIVE ERROR

Third, the Appellant assigns that the district court's evidentiary errors as argued in previous sections of his brief, when viewed together, "have a cumulative prejudicial effect and require reversal for a new trial." Brief for appellant at 28.

Nebraska appellate courts have recognized the cumulative error doctrine in the context of a criminal jury trial explaining that while one or more errors, standing alone, may not constitute reversible error, if their cumulative effect was to deprive the defendant of a fair and impartial trial, a new trial must be granted. *State v. Dap*, 315 Neb. 466, 997 N.W.2d 363 (2023).

Because we find that the district court did not err in overruling appellant's motion in limine and the Appellant failed to preserve his assigned error associated with the court's order precluding appellant from calling Dr. Partida, this assignment of error fails.

### 4. INEFFECTIVE ASSISTANCE OF COUNSEL

Fourth, the Appellant assigns that he received ineffective assistance of trial counsel when counsel: (a) failed to disclose Dr. Partida and the documentation in exhibits 1 and 2 resulting in a discovery violation; (b) failed to move for sanctions against the State for late produced discovery and a continuance within which to pursue a *Trammell* motion for disclosure of T.G.T.'s counseling records; and (c) failed to investigate and present evidence about sexually transmitted diseases.

In *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020), the Nebraska Supreme Court provided the standard for determining whether a claim of ineffective assistance of counsel can be determined on direct appeal, stating:

> In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.
>
> When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Once raised,

the appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims.

In order to know whether the record is insufficient to address assertions on direct appeal that trial counsel was ineffective, appellate counsel must assign and argue deficiency with enough particularity (1) for an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) for a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court. When a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel.

Further, in order to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.D. 668, 104 S. Ct. 2052 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Miranda*, 313 Neb. 358, 984 N.W.2d 261 (2023). To show that counsel's performance was deficient, the defendant must show counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* To show prejudice under the prejudice component of *Strickland*, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. *Id.*

(a) Failure to Disclose Expert During Discovery

The Appellant assigns that trial counsel provided ineffective assistance in failing to disclose the medical report issued by Dr. Partida and in failing to identify Dr. Partida as a witness which led to the court's order precluding the Appellant from calling Dr. Partida as a witness at trial. As the Appellant indicates in his brief, the sole reason he intended to call Dr. Partida was to ask her about T.G.T.'s statement to Dr. Partida about when the last assault occurred and that he would use the medical report to refresh her recollection if necessary.

As indicated in that report, T.G.T. reported to Dr. Partida that the last time the Appellant sexually assaulted her occurred 4 months before Dr. Partida's March 25, 2022, examination of the victim. If T.G.T.'s report regarding the date of the last assault was accurate, that would predate the arrival of T.G.T. and her family in Grand Island, which occurred on December 1, 2021. That testimony would have been in stark contrast to T.G.T.'s detailed testimony describing an assault that occurred at the Appellant's home in Grand Island.

But as we noted earlier in this opinion, notwithstanding the court's pretrial order precluding the Appellant from calling Dr. Partida as a witness at trial, the Appellant failed to make an offer of proof at trial as to what Dr. Partida would have testified to had she been called. Further, during cross-examination of T.G.T., the Appellant never questioned her regarding her alleged disclosure to Dr. Partida that the last time that the Appellant sexually assaulted her occurred 4 months prior. Nor did trial counsel attempt to impeach T.G.T. with the medical record of her March 25, 2022, appointment with Dr. Partida such that the trial court never had the opportunity to revisit its pretrial

ruling. To that end, it is notable that the pretrial order reflected a bar to the defense calling Dr. Partida as a witness but did not reference the utilization of the medical record itself. We note that the Appellant's appellate counsel did not assign error to trial counsel's failure to make an offer of proof or in failing to address the timing issue with T.G.T. The assigned error only addresses trial counsel's failure to disclose Dr. Partida and her medical report which led to the pretrial order.

Lastly, we note that although trial counsel attempted to offer the medical report into evidence while questioning Investigator Champion, appellate counsel did not assign error to the district court's sustaining the State's multiple objections to that report. Thus, as to the specifically assigned error, to wit, trial counsel's failure to disclose Dr. Partida as a witness or identify her medical record which led to the pretrial order barring the Appellant from calling her to testify, the record is sufficient to find there was no prejudice associated with this alleged conduct in that these issues were not raised at trial and appellate counsel did not assign error associated with trial counsel's conduct at trial. This assignment fails and the issue is not preserved.

### (b) Failure to Move for Discovery Sanctions Against State and Make Motion for Continuance

The Appellant assigns that his trial counsel was ineffective when counsel failed to move for discovery sanctions against the State for late produced discovery and in failing to request a continuance within which to pursue a *Trammell* motion for the disclosure of T.G.T.'s counseling records.

On the Friday before the trial was scheduled to begin, the court held a status hearing. During the hearing, the State indicated that after T.G.T. was deposed in July 2022 and made some concerning statements to her guardian ad litem as it related to her safety while in her mother's care, law enforcement removed T.G.T. from her mother's home. A juvenile case was subsequently filed, and as part of that case, T.G.T. began participating in counseling services. The State indicated that law enforcement provided her with a police report and video recordings of the interviews related to the removal on Wednesday. The State sent those to the Appellant's counsel the following day despite having sent law enforcement's removal affidavit to counsel a month prior. The State indicated that during a conversation with the Appellant's counsel wherein counsel asked whether T.G.T. had received a psychiatric evaluation as part of the juvenile case, the State provided:

> I am not the prosecutor handling that case. I did look in our case file, and we aren't in possession of any records with regards to an evaluation. There are case plans and court reports. I did indicate that she was seeing a counselor. I disclosed the name of that counselor.
>
> At that point, I became concerned that the information should not have been disclosed. I think Nebraska Juvenile Code 43-2,108 is dispositive on that issue, that documents that are retained within a court file, as part of a juvenile case, cannot be disclosed without a specific order of the juvenile court.

The State further indicated that it believed the proper procedure for the Appellant to obtain a court order for the release of the records was through a *Trammell* motion. Thereafter, the following colloquy occurred between defense counsel and the court regarding the procedure for

requesting the court to order the State to release the information regarding T.G.T.'s counseling records:

> THE COURT: Are you intending to file a Trammell motion?
>
> [Defense Counsel]: If you want me to file a Trammell motion, I can file one right now verbally.
>
> THE COURT: I don't want you to do anything you are not wanting to do.
>
> [Defense Counsel]: I am willing to do it. I am asking you to provide us with those documents.
>
> THE COURT: Anything else?
>
> [Defense Counsel]: No.
>
> . . . .
>
> THE COURT: Turning to the oral motion today for discovery relating to the name of the psychologist and information, including record of the psychologist for the minor victim, State v. Trammell –
>
> [Defense Counsel]: I'll withdraw that motion. Don't even bother.
>
> THE COURT: You don't want to –
>
> [Defense Counsel]: I will withdraw it.
>
> THE COURT: Based upon the withdrawal of the motion, the Court will not address that issue.

Here the record is unclear as to what the requested material would have contained or why defense counsel withdrew the oral motion for discovery of T.G.T.'s psychological records or failed to request a continuance. Therefore, we cannot address this portion of the assignment on direct appeal. In so far as the Appellant assigns that trial counsel should have sought discovery sanctions against the State for any alleged late disclosure, the record indicates that the State was not aware of the police report or video recordings of the interviews related to the removal until the Wednesday before trial. The State provided the report and footage to defense counsel the following day and brought the late disclosure to the court's attention. Further, the State did not appear to elicit any testimony related to the counseling records during the trial, and appellant does not otherwise indicate why a sanction would have been necessary. Therefore, with the exception of the part of the assignment related to trial counsel's failure to seek discovery sanctions, this claim is preserved.

(c) Failure to Present Evidence of<br>Sexually Transmitted Disease

The Appellant assigns that his trial counsel was ineffective for failing to investigate and present evidence about sexually transmitted disease during trial. More specifically, the Appellant argues that he informed his trial counsel that he had been diagnosed with genital herpes in 2020. He argues that he believed that T.G.T. tested negative for herpes making T.G.T.'s testimony that the Appellant sexually assaulted her very unlikely. He contends that his trial counsel did not ask T.G.T.'s mother about it and such evidence would have been compelling and exculpatory.

The record does not indicate what, if any, investigation trial counsel conducted into how genital herpes is spread, nor does the record indicate why counsel may have chosen not to present evidence on the likelihood of spreading genital herpes. The record here is insufficient to adequately address this assignment of error on direct appeal and it is preserved.

## VI. CONCLUSION

Finding that the Appellant's assignments of error are without merit with the exception of his preserved ineffective assistance of counsel claims, we affirm the Appellant's conviction and sentence.

AFFIRMED.