# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 24-2026

———————————————

Marqus Patton

*Plaintiff - Appellant*

v.

Taggart Boyd, Warden of the Reception and Treatment Center; Michael Hilgers, Nebraska Attorney General; Rob Jeffreys, Director of the Nebraska Department of Correctional Services

*Defendants - Appellees*

——————————

Appeal from United States District Court
for the District of Nebraska - Omaha

——————————

Submitted: February 11, 2025
Filed: June 13, 2025

——————————

Before SMITH, KELLY, and KOBES, Circuit Judges.

——————————

KELLY, Circuit Judge.

After the attempted robbery and fatal shooting of Kristopher Winters in Omaha, a Nebraska jury convicted Marqus Patton of first-degree murder and using a deadly weapon during a robbery. Before us is Patton's petition for habeas corpus under 28 U.S.C. § 2254(d), in which he alleges the State violated his due process

rights by failing to disclose that it had tacit plea agreements with two witnesses who testified against him at trial. The district court[1] denied Patton's petition but granted a certificate of appealability. We affirm.

I.

A.

On July 6, 2011, Patton and four others—Emily Gusman, Drake Northrop, Ryan Elseman, and Nicholas Ely—attempted to rob Winters, a seventeen-year-old who sold marijuana from his mother's basement. At Patton's trial, the government relied extensively on the testimony of Gusman and Northrop, who both gave accounts of what happened that day.

Gusman testified as follows. The day before the robbery, she, Patton, Elseman, and Ely met up at Ely's house, where they stayed overnight. The following morning, the four of them decided to go swimming, and Northrop picked them up in his car around 11:45 a.m. During the drive, Gusman suggested the group buy marijuana from Winters before their swim. Gusman had been to Winters's house twice in the past and had bought marijuana from him there both times. Gusman showed Northrop the way to Winters's house and, while they drove, the plan changed from buying marijuana to robbing Winters. When they arrived, Gusman found her way inside the basement, trailing a friend of Winters, Eric Brusha, who happened to have arrived at the same time. She then texted Elseman that she was inside, and others came into the basement; Gusman hid by a bookcase and did not see who entered or what happened, but she heard a scuffle and a gunshot. Gusman

---

[1]The Honorable Joseph F. Bataillon, United States District Judge for the District of Nebraska.

left the house soon after, passing Winters on her way out. Gusman was arrested shortly thereafter.[2]

Northrop also testified. According to Northrop, the group decided to buy marijuana from Winters before going swimming, but then Elseman and Ely suggested robbing him instead, claiming "it would be an easy lick." Everyone ultimately agreed on the plan. Gusman entered the home, and once Elseman got her text giving a green light, the four left Northrop's car and walked toward the house. As they approached, Northrop noticed that Elseman and Patton had guns. They entered the basement and encountered Winters. Elseman raised his gun and said, "You know what it is," and Winters "rush[ed] [Elseman] and grab[bed] him." During the ensuing struggle, Patton pistol-whipped Winters on the head; Winters "stumbled back[,] and then grabbed a chair and rammed Mr. Patton." Patton told Elseman to shoot Winters and Elseman did so. Northrop, Ely, Elseman, and Patton then fled in Northrop's car. Once in the car, Patton lifted his shirt, showing blood on his abdomen, and claimed "he got grazed by the bullet."

Both Gusman and Northrop testified extensively about their motives for cooperating with the State, claiming they hoped their cooperation would earn them leniency, but that they had not been promised anything. For example, when asked whether she "ha[d] a hope or an expectation of what [she] th[ought] [wa]s going to happen to [he]r pending criminal case," Gusman replied, "Yes." Gusman, who was fifteen at the time of the offense, testified that she had been "charged with first degree murder" but that she hoped "[t]o get it dropped down to juvenile." However, she denied having "been told that that is going to happen for sure," and insisted that "[t]here's no deal." And when asked "[w]hat happens to you depends in large part how you testify in court, correct?" Gusman replied, "I believe so, yes." Northrop, who told the jury he had been charged with first-degree murder for Winters's death,

---

[2]Brusha testified that when he arrived at the house, Gusman followed him inside. Brusha stayed at the home until officers arrived and agreed to go to the station with them; on the way, he saw Gusman walking on the street and told the officers she had been present during the shooting. The officers brought her in as well.

also testified that he "hope[d] to get a deal." On cross-examination, he admitted he was "in a position where [he] ha[d] to testify for the prosecutors" to save himself, that he hoped he would get a deal to "walk out of the jail as quickly as . . . possibl[e]," that he was "willing to kind of bet on the come" that he would earn leniency of some kind through testifying, and that his "attorney said that we are hoping to get a deal."

Outside the presence of the jury, Patton's lawyer made offers of proof containing testimony from both Gusman's and Northrop's lawyers about whether the State had promised either witness a specific sentence in exchange for their testimony. See State v. Schreiner, 754 N.W.2d 742, 755 (Neb. 2008) ("[I]n order to predicate error upon a ruling of the court refusing to permit a witness to testify, or to answer a specific question, the record must show an offer to prove the facts sought to be elicited." (discussing Neb. Rev. Stat. Ann. § 27-103(1)(b) (West. 1975))). Gusman's lawyer claimed that "[t]here's never been an express agreement . . . or anything in writing or any deal that would lead to Emily going to juvenile court," but he admitted, "I have an expectation that she will end up in juvenile court based on the conversations I've had. Although . . . I can't tell the Court how that's going to happen." He did not "see[] the need for an express agreement because . . . she's made a good case for herself to warrant her motion to transfer to juvenile court." And he was "confident" that would be the ultimate result. Northrop's lawyer claimed that he had spoken to a prosecutor early in the case, and though he had "got[ten] no specific agreement in writing or one that would be put on the record," he had been told that "they would consider lesser offenses, depending on how things came out."

On November 13, 2012, the jury convicted Patton. The court later sentenced him to life in prison for first-degree murder and an additional five to fifteen years for the use of a deadly weapon to commit a felony. Two days after the verdict, prosecutors reduced Northrop's charges from first-degree murder to "Criminal Conspiracy, a Class II felony" under Nebraska law, and he was sentenced to 10 years in prison, with credit for the year and a half he had already been incarcerated. And on December 31, 2012, on the State's motion, Gusman's case was transferred to juvenile court.

-4-

B.

On direct appeal, Patton argued that the State failed to disclose to the defense that it had entered tacit plea agreements with Gusman and Northrop, violating Patton's due process rights under Brady v. Maryland, 373 U.S. 83 (1963) and United States v. Bagley, 473 U.S. 667 (1985). See State v. Patton, 845 N.W.2d 572, 582–83 (Neb. 2014).[3] The Nebraska Supreme Court affirmed. Id. at 585. Looking at both the trial testimony and Patton's offers of proof, the Court found that "the evidence in this record does not establish the existence of tacit plea agreements." Id. at 584. To the Court, Gusman and Northrop "[b]oth testified that they hoped to obtain leniency in exchange for their testimony but had not received any assurances or promises from the State." Id. As to the offers of proof, the Court found that "[t]he attorneys' testimony would not have impeached the testimony of [Gusman] and Northrop, because it was consistent with both witnesses' testimony that they hoped for leniency in exchange for their testimony, but had received no promises." Id. at 583–84.

Patton filed a motion for state postconviction relief on March 5, 2015. The proceedings resulted in three separate evidentiary hearings in which Patton sought to prove that Gusman and Northrop had testified pursuant to tacit plea agreements the State failed to disclose.

At the first hearing on July 1, 2016, Northrop testified, just days before he was going to finish his prison term. He denied that he had been "informed of a specific number that the State would recommend," and when pressed, stated that he could not remember any such promise.

The second hearing occurred on May 24, 2017. Thomas Olsen, Northrop's lawyer, testified that "at some point it was determined that [the prosecutors] were

---

[3]Patton raised other claims on direct appeal that he has since abandoned. See Patton, 845 N.W.2d at 577.

willing to [work with Northrop]," and that if he "testif[ied] in all the trials against all the defendants,"[4] then "they would take that into consideration." Olsen described this as "a leap of faith." According to Olsen, "[t]here was nothing set in concrete as to what [Northrop] would get," and that regarding sentencing, Olsen had told Northrop only that he "was hopeful of something in the range of the 10 years, 15, something like that, where [Northrop] would hopefully do less than a 10-year calendar sentence."

Two other witnesses also testified at the second hearing. One was Justin Busch, a man who had shared a cell with Northrop at the Douglas County Jail for four to five weeks in 2012. Busch testified that, when they shared a cell, Northrop had told him that he had "a deal" with prosecutors and "was being told that he had to . . . change what he originally wanted to say to make it sound more, I guess, better for the [State]." Northrop claimed that "as long as he followed what [prosecutors] had told him, he would get a 10 to 15 or a 10 to 10, maybe." Next, a trial assistant with the Douglas County Public Defender's Office testified. She said that after Northrop testified at the first postconviction hearing, Northrop called the office that same day and asked to speak with them. The trial assistant visited Northrop at the jail, and there, he claimed to her that in fact, his attorney had told him "that he couldn't promise me that I had a deal but that I had a deal." However, according to the trial assistant, Northrop refused to sign an affidavit attesting to this assertion because "he was worried about being found in contempt of court." The state court found that Northrop's alleged statements to the trial assistant were inadmissible hearsay, so Patton's lawyers admitted them by way of an offer of proof.

At the final postconviction hearing on March 28, 2019, the parties stipulated that Matt Kuhse, the deputy county attorney and prosecutor in the case, "would . . . testify that there were no plea offers made to Mr. Northrop as part of him testifying." In the lengthy period between the second and third evidentiary hearings, Patton's

---

[4]Northrop and Gusman testified against Elseman and Ely as well.

-6-

attorneys had tried to get Northrop to return and testify to what he had told the trial assistant, but they were unsuccessful.

In a short order, the state trial court denied Patton's postconviction petition, and the Nebraska Supreme Court affirmed.

Nearly a year later, Patton filed a habeas petition in federal court, raising the same claims. And in an order dated March 22, 2024, the district court denied habeas relief. On the merits, the district court was "skeptical that there was no agreement between the State and Gusman and Northrop." To the district court, "[t]he evidence points to the State purposely avoiding making express agreements while engaging in implied deal-making with the witnesses' attorneys." However, given the conflicting evidence, the district court concluded that the Nebraska Supreme Court's contrary reading of the facts was not "unreasonable" within the meaning of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). See 28 U.S.C. § 2254(d)(2). Additionally, the district court concluded that it "c[ouldn't] say" that any disclosure of tacit agreements would have been material to the outcome of the trial, as required for a Brady claim, given the "extensive[] and aggressive[]" cross-examination Patton's attorney performed on Gusman and Northrop concerning their hopes for leniency. However, the district court granted a certificate of appealability, finding that "reasonable jurists could debate whether tacit plea agreements existed and whether that should be a basis for granting habeas corpus relief." See 28 U.S.C. § 2253(c).

Patton appeals.

II.

"On appeal of a district court's denial of a § 2254 petition, we review the district court's findings of fact for clear error and its conclusions of law de novo." White v. Steele, 853 F.3d 486, 489 (8th Cir. 2017) (quoting Wright v. Bowersox, 720 F.3d 979, 983 (8th Cir. 2013)). For a petitioner whose "claim . . . was adjudicated

-7-

on the merits in State court proceedings," a federal court "shall not" grant relief unless the State adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[5] 28 U.S.C. § 2254(d).

Patton argues that the state court's conclusion that Gusman and Northrop had not testified pursuant to tacit plea agreements was unreasonable. Under AEDPA's deferential standard, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). And "[w]ith respect to § 2254(d)(2)'s 'unreasonable determination of the facts' clause, '[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" Boss v. Ludwick, 760 F.3d 805, 810 (8th Cir. 2014) (per curiam) (quoting Schriro v. Landrigan, 550 U.S. 465, 473 (2007)).

In Patton's case, the Nebraska Supreme Court on direct appeal determined that no due process violation occurred because the evidence did not support "the existence of tacit plea agreements." Patton, 845 N.W.2d at 584; see also White, 853 F.3d at 490–91 ("Brady's disclosure mandate extends to 'agreements or

---

[5]In 2022, the district court had held that Patton's federal habeas petition was untimely, see 28 U.S.C. § 2244(d)(1)(A), but that Patton was entitled to equitable tolling of the statute of limitations. And in its 2024 order, the district court denied the State's request that it reconsider its equitable tolling decision. On appeal, the State urges as an alternative ground for affirmance that the district court erred in equitably tolling Patton's claim, but "in the interest of judicial economy," we proceed directly to review under § 2254(d). See White, 853 F.3d at 490; see also Trussell v. Bowersox, 447 F.3d 588, 590 (8th Cir. 2006) (proceeding to the merits of habeas petition despite likelihood it was untimely); Dodge v. Robinson, 625 F.3d 1014, 1017 n.1 (8th Cir. 2010) (declining to address procedural default where claim was more easily resolved on the merits).

understandings between the government and a witness for leniency in exchange for testimony.'" (quoting United States v. Rushing, 388 F.3d 1153, 1158 (8th Cir. 2004) (per curiam))); Napue v. Illinois, 360 U.S. 264, 269–70 (1959) (noting "[a] State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction," including by failing to correct a witness's testimony that he had not received consideration for his testimony). The state trial court denied Patton postconviction relief on the same constitutional ground, determining that "[h]aving reviewed the evidence, along with the postconviction motion . . . [he] ha[d] failed to meet his burden in establishing a constitutional deprivation," and the Nebraska Supreme Court affirmed. Accordingly, we ask if "fairminded jurists could disagree" about whether the evidence raised at trial and on collateral review shows that Gusman and Northrop testified pursuant to tacit plea agreements with the State, in violation of Patton's due process rights.[6] Harrington, 562 U.S. at 101 (quotation omitted).

---

[6]Patton argues that "[t]he only factual findings were made on Patton's direct appeal, which was limited to what was known at the time of the trial in this case," and urges us to address the merits of his claim de novo because "it is unclear" whether the state courts adequately considered the evidence surfaced in the three state postconviction hearings. We reject this argument. After hearing new evidence, the state trial court denied Patton's postconviction claim on the merits, and the Nebraska Supreme Court affirmed, concluding that the "[state trial court's] findings of fact and conclusions of law were adequate to support [its] disposition." The parties thus do not meaningfully dispute that the state postconviction court's decision adjudicated Patton's due process claims. Where, as here, a state court clearly denies a federal claim on the merits after hearing new evidence, but its "decision is unaccompanied by [further] explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Harrington, 562 U.S. at 98; see also Wilson v. Sellers, 584 U.S. 122, 125 (2018) (noting courts must look "to the last related state-court decision that does provide a relevant rationale" and "presume that the unexplained decision adopted the same reasoning," but that "the State may rebut the presumption by showing that" the summary affirmance relied on other grounds "briefed or argued . . . or obvious in the record"). Put differently, our task under AEDPA in these circumstances is not to assess the state postconviction court's reasoning—which its denial order largely lacked—but rather to determine whether the court's *conclusion* that no due process

-9-

We cannot say that the State court's determination of the facts was unreasonable within the meaning of § 2254(d). A State court's factual determinations are unreasonable if they "could not reasonably be derived from the state court evidentiary record." Ervin v. Bowersox, 892 F.3d 979, 985 (8th Cir. 2018) (quoting Barnes v. Hammer, 765 F.3d 810, 814 (8th Cir. 2014)). The petitioner bears "the burden of rebutting . . . by clear and convincing evidence" the presumption that the state court's findings of fact are correct, 28 U.S.C. § 2254(e)(1), and pointing to "some contrary evidence in the record" is not enough to render a state court's determination unreasonable under AEDPA, Ervin, 892 F.3d at 985 (quoting Cole v. Roper, 783 F.3d 707, 711 (8th Cir. 2015)).

In Patton's case, evidence supported either conclusion as to the existence of tacit plea agreements. For example, evidence at trial and in the postconviction hearings suggested Gusman and Northrop had tacit plea agreements. Gusman's attorney testified to having "an expectation . . . based on . . . conversations" that Gusman would "end up in juvenile court," and was unsure only of the exact process through which that would happen. Northrop's attorney also claimed that the prosecutors told him "they would consider lesser offenses, depending on how things came out." And the postconviction proceedings surfaced hearsay evidence of a tacit plea agreement—namely, testimony from Northrop's cellmate and the trial assistant for the public defender that Northrop told them such an agreement existed.

But this select evidence does not clearly and convincingly rebut the presumption of correctness we must afford the state's opposite conclusion. See Ervin, 892 F.3d at 985 (noting petitioner bears the burden to "rebut[]" the presumption that the state court's factual determinations are correct "by clear and convincing evidence"). Both Gusman and Northrop repeatedly and explicitly denied on the stand that there were tacit plea agreements, and though both Gusman's and Northrop's attorneys used language about expecting results for their clients, both

violation occurred amounted to an "unreasonable determination of the facts in light of the evidence presented in the [postconviction] proceeding[s]." 28 U.S.C. § 2254(d).

-10-

lawyers also denied the existence of any agreement guaranteeing such a result in exchange for their clients' testimony. Additionally, the parties stipulated that a prosecutor in Patton's case would testify "that there were no plea offers made to Mr. Northrop as part of him testifying." And finally, though hearsay evidence suggested that Northrop had in fact had a deal with prosecutors, Northrop himself refused to say so under oath.

Because the state court's factual conclusions can "reasonably be derived from the state court evidentiary record," Ervin, 892 F.3d at 985 (quotation omitted), the state court's adjudication of Patton's claim was not "an unreasonable determination of the facts," 28 U.S.C. § 2254(d). AEDPA precludes the relief Patton seeks.

We affirm.

_____